IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 13, 2007 Session

**ANNA C. BURDEN v. HARRY DONALD BURDEN**

**Appeal from the Chancery Court for Campbell County**
**No. 04-088     Billy Joe White, Chancellor**

---

**No. E2006-01466-COA-R3-CV  - FILED SEPTEMBER 26, 2007**

---

In this divorce case, Anna C. Burden ("Wife") challenges the trial court's award of joint custody and its adoption of the Permanent Parenting Plan submitted by Harry Donald Burden ("Husband"), which plan provides for equal parenting time with regard to the parties' child, A.V. ("Child").  Wife contends that she should be the primary residential parent, with Husband having visitation rights. Wife also challenges the court's division of the marital property and its denial of alimony.  We reverse as to custody, affirm as to the division of property, and vacate the judgment as to alimony. This case is remanded for further proceedings on the issue of alimony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Affirmed in Part and Vacated in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Vivian Crandall, Oak Ridge, Tennessee, for the appellant, Anna C. Burden.

Johnny V. Dunaway, LaFollette, Tennessee, for the appellee, Harry Donald Burden.

**OPINION**

I.

On June 2, 2004, Husband filed for divorce and submitted a Temporary Parenting Plan with a proposed week-to-week co-parenting schedule.  The court immediately adopted Husband's plan *ex parte*.  Wife filed her answer and counterclaim on June 30, 2004, and simultaneously filed her own proposed Temporary Parenting Plan and a Motion to Quash Husband's plan.  Wife requested primary residential parenting rights, with Husband having co-parenting time "at any time that the child chooses but in no event less than two days weekly."  Wife also requested alimony.  Each party claimed the other was at fault for the breakup of their marriage, but both agreed that they had irreconcilable differences.

In her June 30 motions, Wife alleged that Husband has a history of abusive behavior and an "emotional impairment" that impairs his emotional ties with Child, and argued that it is therefore in Child's best interest to remain with Wife. Husband filed his answer on July 4, 2004, denying these allegations and reiterating his contention that equal parenting time is in Child's best interest. Also on July 4, Husband filed a motion asking the court to select a psychologist to perform a custodial evaluation. The court set these motions for a hearing on August 30, 2004, at which time it ordered the psychological evaluation and declined to quash Husband's parenting plan. The court said it wanted to wait until the evaluation was received before disturbing the temporary plan that it had adopted *ex parte* on June 2. In so ruling, the court opined as follows:

> THE COURT: I would like to have a psychiatric evaluation before I ever rule on this. [Wife] may be absolutely right, but I can't let her tell me the child is unhappy. [Husband]'s going to tell me the child is happy. Then what do I do? Is it a beauty contest? No. We ought to do what's in the best interest of the child.
>
> * * *
>
> THE COURT: These child psychologists can talk to her and analyze why she says what she says, whatever that is, and they can come in with recommendations and the Court will be happy to follow them, whatever they are, if they're reasonable.
>
> * * *
>
> THE COURT: I don't feel that there's any kind of emergency situation here. At worst, [the current parenting arrangement] may not be the best situation. It may be the best situation; I don't know. I certainly would like to have this evaluation done before I rule on this matter. I've literally tried thousands of these things. These [parents] are intelligent, nice people and the mother's going to say something and the daddy's going to say something. What do I do, just go by tradition or go by the new philosophy? I'd sure like to have some expert help on it. If we do it today and [then] you get the expert help, then we're going to have to do it again. So let's just have them seen by the doctors and save us all some time. You can get this matter set back on the docket immediately upon these doctors making whatever recommendations. Unless it's unreasonable, the Court will follow it. You can be on notice of that.

The psychological evaluation was substantially delayed, apparently by circumstances beyond either party's control. It was finally received by the court on April 12, 2005, more than seven months after the August 30, 2004 hearing and three weeks before the trial was set to begin on May 3, 2005.

The evaluation, conducted by Dr. Abraham Brietstein, concluded that Wife has historically been Child's primary caretaker; that Husband has a distant relationship with Child, thanks in large part to his emotional and psychological problems; and that the week-to-week joint custody arrangement is harmful to Child, and should be replaced with an arrangement that makes Wife the primary residential parent while giving Husband reasonable visitation rights.

Presumably because Dr. Brietstein's report was filed so close to the date of trial, no hearing on modifying the temporary parenting situation was ever held, as originally envisioned by both parties and the court. Instead, the debate shifted to what the permanent parenting arrangement should be. Wife filed her proposed Permanent Parenting Plan on April 25, 2005, essentially echoing Dr. Brietstein's recommendations. On May 4, the second day of trial, Husband filed his proposed Permanent Parenting Plan during his rebuttal case. It was substantially identical to his Temporary Parenting Plan, which by this point had been in place, by *ex parte* order, for more than 11 months.

At trial, both sides presented extensive evidence regarding financial matters relevant to the property and alimony determinations, as well as extensive evidence relating to the question of custody. The court issued its ruling by memorandum opinion at the conclusion of the trial on May 4, 2005. It held that the parenting situation should "remain as is," rejecting the central conclusions of the court-ordered psychologist's report. The court called parts of the report "ludicrous" and declared Husband to be "a totally good parent."

The court's May 4 opinion was incorporated into a Judgment of Divorce, which was filed on June 1, 2005. In addition to adopting Husband's Permanent Parenting Plan, it officially granted the divorce and ordered a judicial auction of the parties' house and various items of personal property. However, a number of issues related to division of property were reserved for later resolution.

A hearing on the reserved issues was held on December 5, 2005. At the conclusion of that hearing, the court awarded both parties the furnishings and automobiles in their possession and the pension, retirement, and financial accounts in their names, while awarding Husband his guns and Wife her jewelry (neither of which were assigned a value). To "balance the equities," the court granted Wife an award of $50,000[1] from "off the top" of the judicial auction proceeds. The remainder of the proceeds were ordered to be split equally between the parties. The court rejected Wife's argument that she is entitled to a greater award "off the top" because Husband allegedly took funds out of the marital estate in anticipation of divorce. It also denied her claim for alimony, stating, "I've not heard any proof on alimony." Finally, the court refused at the December 5 hearing

---

[1] The court verbally put this amount at $49,000, but the written order on December 17, 2005 stated it as $50,000.

to consider Wife's motion to reconsider the custody determination. Wife then made an offer of proof containing testimony from Dr. Brietstein suggesting that the court had misinterpreted his report.

Wife appeals the trial court's rulings on custody, division of property, and alimony. We address the issues in that sequence.

## II.

### A.

"[N]either trial nor appellate judges have any responsibility greater than to attempt to correctly adjudicate child custody disputes." ***Deitmen v. Deitmen***, No. 86-30-II, 1986 WL 6057, at *1 (Tenn. Ct. App. M.S., filed May 29, 1986). "However, . . . the trial judge, not the appellate court, has the opportunity to observe the witnesses. All we can review is the cold printed word and the exhibits." ***Id.*** Therefore, a trial court has broad discretion regarding a custody determination. ***Brumit v. Brumit***, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997). We will not disturb such a determination unless the record reflects an abuse of that discretion.

Our review is *de novo* upon the record of the proceedings below; however, that record comes to us with a presumption that the trial judge's factual findings are correct. Tenn. R. App. P. 13(d). We must honor this presumption unless we find that the evidence preponderates against those findings. ***Id.***; ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984). "Our review of the trial court's conclusions on matters of law, however, is *de novo* with no presumption of correctness. ***Taylor v. Fezell***, 158 S.W.3d 352, 357 (Tenn. 2005). We likewise review the trial court's application of law to the facts *de novo*, with no presumption of correctness. ***State v. Thacker***, 164 S.W.3d 208, 248 (Tenn. 2005)." ***Clark v. Clark***, No. M2006-00934-COA-R3-CV, 2007 WL 1462226, at *3 (Tenn. Ct. App. M.S., filed May 18, 2007). Nor does the presumption of correctness attach to "the trial court's conclusions that are based on undisputed facts." ***Hall v. Houston***, No. M2002-01371-COA-R3-CV, 2003 WL 21688578, at *3 (Tenn. Ct. App. M.S., filed July 21, 2003).

Because the trial judge is in the best position to assess the credibility of the witnesses, such credibility determinations are entitled to great weight on appeal. ***Massengale v. Massengale***, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); ***Bowman v. Bowman***, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). However, with regard to expert opinion that appears in the record purely in the form of written documents, an appeals court "may draw its own conclusions about the weight and credibility of that testimony, since we are in the same position as the trial judge." ***Krick v. City of Lawrenceburg***, 945 S.W.2d 709, 712 (Tenn. 1997). *See also* ***Orman v. Williams Sonoma, Inc.***, 803 S.W.2d 672, 676 (Tenn. 1991) ("All of the medical proof in this case was taken by deposition or was documentary, so that all impressions of weight and credibility must be drawn from the contents thereof, and not from the appearance of witnesses on oral testimony at trial.").

B.

Many facts relating to the child custody issues in this case were heavily disputed, and the trial court is entitled to considerable deference in its determination of which evidence is credible in such situations. However, a number of important factual points were undisputed. Some of these facts will be elucidated in the course of discussing the issues, but several key points are worth noting at the outset.

It is undisputed that Husband has serious psychological problems. He is prone to panic attacks, irrational fears, and obsessive-compulsive behaviors. His own witnesses acknowledge this fact, and he himself also acknowledges it repeatedly in his testimony. Husband's brief states that he "has long been diagnosed with panic attacks, anxiety and obsessive compulsive disorder."

It is also undisputed that Husband's psychological problems have negatively impacted Child in various ways. Husband attempts to downplay these impacts, but does not deny several specific examples. For instance, Child has been deprived of the opportunity to go on vacations with her father because he assiduously avoids "crowded places [and] trips" due to his panic disorder (Husband's testimony); he has not been on vacation since his honeymoon to Gatlinburg nearly twenty years ago. Likewise, for the same reason, Child has been deprived of her father's presence and participation in extracurricular activities such as piano and dance (Husband's testimony). In addition, Child has been subjected to various manifestations of Husband's irrational anxieties, including his insistence that Child and Wife lock the bedroom door when they are inside (Husband's testimony), his angry reaction to a slumber party (Wife's uncontradicted testimony), and his repeated searches of Child's lunch and book bag (Husband's testimony). As a result of the latter behavior, Child frequently hid her possessions, according to Wife's testimony: "She couldn't bring [her book bag or lunch] in because it caused a big scene and he would have to go through everything." The parties dispute whether Husband took these actions for fear that *he* would harm Child, or for fear that someone else would harm her, but neither the actions themselves nor their relation to his illness are in dispute. In addition, Husband's testimony that he was never worried about *himself* putting something harmful in Child's lunch appears to be contradicted by his own deposition, as noted on cross-examination. Dr. Brietstein's report also corroborates Wife's account that Husband irrationally feared *he* would harm Child or others by placing harmful items in her book bag or her lunch.

Wife's allegations of physical abuse by Husband are hotly contested, at least as to the label placed on the behavior, but again, several points are undisputed. Husband admits the occurrence of the so-called "green bean incident," in which he threw beans at Wife; the number of beans thrown is disputed, but the basic act is not. At trial, Husband neither admitted nor denied Wife's other specific allegations of abuse – e.g., that, in Child's presence, Husband threw a bottle of mustard at Wife so hard that it bruised her rib; that he pushed a heavy TV box down on Wife, causing Child to scream in distress; that he would sometimes throw Child's toys, or other objects, at Wife; and that Child would sometimes physically insert herself between her parents to prevent Husband from hitting Wife – but he did admit in general terms that he would sometimes "physically strike" Wife, and that Child was present on some of these occasions. Husband claims he was always "provoked"

and that Wife was usually the "aggressor" in these incidents, but his testimony indicates that her aggression was not necessarily physical in nature, indeed that she would exhibit hostility "mostly" by "yelling" and "calling me names."[2]  He even appears to suggest that her purported provocation sometimes amounted to nothing more than angering him by not cooking or doing housework.[3]  In any event, the core fact that Husband sometimes physically hit Wife, sometimes in the presence of Child, is undisputed.

Finally, no evidence was introduced questioning the qualifications or credibility of the court-appointed expert, Dr. Brietstein,[4] whose psychological evaluation was requested by Husband and consented to by Wife and the court.  Dr. Brietstein's written report was received into evidence, again without objection from either party.  Dr. Brietstein was neither called to testify nor contradicted by any opposing expert testimony.  His report reveals that he undertook a detailed evaluation of Husband, Wife and Child, and concluded as follows:

> The current custodial arrangement, which allows equal co-parenting time, is intended to protect the rights of each parent.  At the same time, this should not come at the child's expense, and is instead best suited for families in which the parents are either equally fit or have an equal, or nearly equal, relationship with the child.  In this instance, neither is Mr. Burden equally fit; nor does he have a nearly equal relationship with his daughter.  Instead, his psychological problems and the limited time he has spent with [Child] have resulted in a lack of closeness in their relationship.  Thus, the current arrangement, which forces [Child] to spend a week at a time with her father, is causing more harm than good, and has resulted in some deterioration in [Child's] emotional adjustment.

---

[2] Husband's brief further elucidates this point: "[Husband] never struck [Wife] without first being provoked by her; she was always the aggressor.  For example, [Husband] would come in after working all day and [Wife] would still be in her nightgown and if [Husband] said anything about [Wife] not doing any housework or cooking dinner, then [Wife] would get hostile and start yelling and calling [Husband] names."

[3] Asked to explain why he was so angry as to throw food at Wife during the "green bean incident," Husband testified, "I don't remember why, but it was just probably one of those typical days. . . . I'd come in and she hadn't done a thing."

[4] The only evidence that attempts to cast Dr. Brietstein in a negative light is Husband's testimony that he felt "very uncomfortable" talking to Dr. Brietstein, that the doctor "acted like I was on trial over there," and that it felt like he was "making fun of" Husband's problems.  However, these assertions, if believed, would seem to bear mostly on Dr. Brietstein's demeanor, not his qualifications or credibility, nor the accuracy of his report.  In any event, Husband's attorney did not pursue the point, and the court apparently did not rely on this evidence in rejecting Dr. Brietstein's conclusions.  We decline to interpret this meager snippet of negative testimony as an indictment of Dr. Brietstein so damning as to cast doubt on the quality of his report.

Notwithstanding this recommendation and the other evidence in Wife's favor, the court decreed that Husband and Wife would have joint custody of Child, and adopted Husband's proposed Permanent Parenting Plan, which continued the week-to-week arrangement that had been in place "temporarily" for the preceding eleven months.

The court's memorandum opinion serves as the only explanation of its reasoning on this point. The relevant portion of the opinion is as follows:

> THE COURT: The first thing I'll say is I've read a lot of evaluations and so forth, and I don't like this one. I don't like the way it is done. I don't like the results. There are some things in it that I think are ludicrous. I'm sure [Dr. Brietstein] is, according to counsel, a talented individual and has kind of written the book on some of these records, but it irritates me when they turn around and say, for instance, on Mr. Burden, "Well, he has a little emotional problem here that he has had since childhood, and in effect, it is nothing. It doesn't amount to anything. It is of no danger to anybody." It might be irritating I guess with him doing some of the things, but Ms. Burden knew about that before she married him. It would be irritating to inspect the medicine and so forth, but there is no danger in that.

> Today is the first time I have ever really met Mr. Burden. He is a totally harmless, gentle person. He is not overly aggressive. I guess he has some aggression or problems. They go on and say that, this doctor does, and then go on over toward the back and say, "Well, as a result of Mr. Burden's emotional problems we're going to do this and that." That is not the proper conclusion. If these emotional problems are of no consequence, as they're not, they should never even be referred to again. These problems are of no consequence in this litigation. There has been some inferences that him searching bags that he might be of some danger, but the Court finds that to be totally untrue. Mr. Burden would be a totally good parent.

> He has some difficulties – Dr. Brietstein talks about this. "Ms. Burden has interfered and attempted to alienate [Child] and interfere with his visitation some. It might be said Ms. Burden maintains an overly close relationship with [Child] with whom [Child] has slept all of her life, at least until the recent separation," and on and on and on. There is some evidence in the record that Ms. Burden has a – I don't know exactly how to term it – very strong overpowering relationship with this child. Of course, since all of these problems have been coming up, it has got to be moreso. It just hurts this Court to hear

-7-

somebody say that the Burden family, whoever it was and whatever it was, was outside and this child would not speak to them. After all this time the relationship – and it has been a close, good family relationship – she has the wrong impression.

I know from what counsel has inferred [sic] and what these witnesses have said given a choice this child would stay with her mother and visit with her father. I know from reading this record and listening to this proof that if this Court were to limit Mr. Burden to just a nominal visitation schedule his parenting is over. He would just be overwhelmed, and there would be no close relationship there between him and his child. There should be. I ordinarily don't particularly like the split custody situation, but sometimes it is necessary.

On Ms. Burden, she is a very nice lady; very well educated; a very bright person. She has only one child; she is very committed to that child. Commenting on their personal relationship, I'm firmly convinced that Ms. Burden is no shrinking violet. If you jumped on Ms. Burden you'd get as much or more than you handed out. She is certainly equal intellectually and otherwise and could cross swords with about anybody. Mr. Burden may have been somewhat aggressive toward her, and that is unfortunate if he was in the presence of this child, but I think that she was never injured and she can pretty much take care of herself.

The Court is going to allow the custody situation to remain as is.

The court's characterization of its ruling as leaving the previous situation "as is" arguably implies that it considered the *status quo* as a factor in the decision. If so, that was an error of law. "In entering a permanent parenting plan, the court shall not draw any presumptions from the provisions of the temporary parenting plan." T.C.A. § 36-6-406(e).

In any event, we find the court's opinion inadequate in several respects. The opinion fails to follow the statutory imperative to prioritize the best interest of the child ahead of the parents' interests; it ignores or denies the relevance of undisputed facts bearing on several highly relevant factors listed in T.C.A. §§ 36-6-106(a) (governing custody determinations) and 36-6-404(b) (governing the establishment of permanent parenting plans); it appears to rely upon several irrelevant and/or impermissible considerations; and it effectively rejects, without adequate evidentiary support for doing so, the duly submitted report of the court's own expert. Interestingly enough, however, the court's opinion relies upon certain portions of the report while discrediting the rest, thus distorting the report's contents. The end result of these errors is that the court's opinion runs contrary to the weight of the evidence.

C.

The most obvious and serious flaw in the court's opinion is its failure to prioritize the best interest of the child. "By statute as well as case law, the welfare and best interests of the child are the paramount concern in custody, visitation, and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs." ***Cummings v. Cummings***, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at \*5 (Tenn. Ct. App. M.S., filed October 15, 2004). "The determination of custody should always be made upon the basis of the best interest of the child, and in accordance with the factors set out in Tenn. Code Ann. § 36-6-106 and Tenn. Code Ann. § 36-6-401."[5] ***Hopkins v. Hopkins***, No. M2002-02233-COA-R3-CV, 2003 WL 21462971, \*4 (Tenn. Ct. App. M.S., filed June 25, 2003) (*perm. app. granted December 15, 2003, as to issue unrelated to this case*). Although the court need not recite the statutory language, there must be some indication that the child's best interest is at the heart of the court's reasoning. Here, there is no such indication. On the contrary, the court appears more concerned with the best interests of the parents – particularly the father – than those of the child.

The law on this point is clear: "Regardless of the parents' interest in a custody arrangement, the overriding responsibility of the court is to approve or order a parenting plan that promotes the best interest and welfare of the particular child." ***Cummings***, 2004 WL 2346000, at \*9. "These decisions are not intended to reward or to punish parents, and, in fact, *the interests of the parents are secondary to those of the children.*" ***Adelsperger v. Adelsperger***, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997) (citation omitted) (emphasis added). Yet the court's opinion repeatedly focuses on the parents' interests. It laments the discussion at trial of Husband's "emotional problems," but does not address the undisputed evidence that Husband's problems have had an impact on Child. Instead, even as it disregards relevant evidence that weighs against its ruling, the court makes the irrelevant point that "Ms. Burden knew about [Husband's problems] before she married him" – a statement that has no bearing whatsoever on a discussion of the effects those problems have had on the *child* of that marriage.

The court also acknowledges Husband's history of physical aggressiveness toward Wife, but says, "I think that she was never injured and she can pretty much take care of herself" – an opinion that might be relevant to a dissection of the marital relationship, but is clearly irrelevant to the issue of Husband's suitability to be a custodial parent. The court allows that it "is unfortunate if he was in the presence of this child" while being "aggressive," but does not pursue the matter further, even though that is the very crux of the issue.

---

[5] T.C.A. § 36-6-401 is the first section of Part 4 of Section 36-6, dealing with Parenting Plans. It outlines the overall purposes and premises of the remainder of the Part. The actual list of factors is found in Part 4, or § 36-6-404. Although the court in ***Hopkins*** cites to Part 1 of the section, or § 36-6-401, it is clearly referring to the same sixteen factors cited repeatedly herein, *i.e.*, those listed in § 36-6-404. A footnote in ***Hopkins*** explains, "Tenn. Code Ann. § 36-6-401, et. seq. is a fairly recent enactment, which requires the incorporation of a detailed permanent parenting plan into any final decree of divorce where a minor child is involved. The criteria for the residential schedule in the plan overlap with, and somewhat expand upon, the factors set out in Tenn. Code Ann. § 36-6-106 for determination of custody." ***Hopkins***, 2003 WL 21462971, \*4 n.1.

In addition, the court's opinion briefly mentions Child's preference to live with Wife, but fails to explain why overriding that preference is in the child's best interest.[6]

Finally and most significantly, the court appears to fundamentally base its ruling on its concern that "if this Court were to limit Mr. Burden to just a nominal visitation schedule[,] his parenting is over." There is indeed some evidence that Wife has interfered or attempted to interfere in various ways with the father-daughter relationship; that evidence is disputed by Wife, but nevertheless the trial court is entitled, in its exercise of discretion and its weighing of credibility, to believe Husband on this point. There is, however, no evidentiary basis for the court's implicit prediction that Wife would interfere so drastically as to blatantly defy her own proposed parenting plan, which would *require* Child to be with Husband every Tuesday evening, one full weekend every other week, four weeks during the summer, the first portion of winter break, and alternating spring and fall breaks. This plan is not, as the court asserts, "nominal visitation"; it is real and substantial visitation, and were Wife to deviate from it so drastically that Husband's "parenting [would be] over," her actions would be in direct violation of a court order, and Husband could seek judicial relief. There is certainly no need to strike preemptively against the possibility of such defiance, especially given that there is nothing in the record suggesting that Wife has a history of violating court orders or otherwise interfering with Husband's rights to the extreme degree contemplated by the language of the opinion.

One could argue that the court was relying on §§ 36-6-106(a)(10) and 36-6-404(b)(3), which list "the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child" as a factor in custody and parenting-plan determinations. However, the court's language – "*his* parenting is over . . . *He* would just be overwhelmed" – again suggests that it was concerned more with Husband's parental rights than with Child's best interest. Moreover, this factor is just one of ten factors under § 36-6-106(a), and one of sixteen factors under § 36-6-404(b), that

_____

[6] Because [Child] was 11 years old at the time of trial, the court was not required to consider her preference, though it was permitted to do so. Section 36-6-106(a)(7) specifies "the reasonable preference of the child if twelve (12) years of age or older" as one of the factors to consider in making a custody determination; § 36-6-406(b)(14) repeats this language in the list of factors for determining the residential schedule. Both sections also state, "The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children." Here, the court acknowledged the child's preference and then disregarded it without explaining why it was doing so. Although it probably would not have been an error of law to not consider the child's preference at all, the manner in which the court considered it, and then seemingly disregarded it without explanation, is further evidence of the court's failure to base its decision on the best interest of the child.

the court "shall" consider if they are relevant – and the record shows that several other factors were indeed extremely relevant, yet the court apparently did not consider them at all.[7]

## D.

For instance, § 36-6-106(a)(5) requires the court to consider, if relevant, "[t]he mental and physical health of the parents." Likewise, § 36-6-404(b)(9) mandates that "[t]he character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child" shall be considered, if implicated by the facts.

As noted earlier, there is abundant, undisputed evidence that Husband has a serious mental health problem, and that this problem impairs his "emotional fitness" in a manner that impacts the child. This latter point is very important. Both Husband and the trial court appear to believe that Husband's mental health itself is on trial. The court's opinion characterizes Dr. Brietstein's report as suggesting that wife should get custody of Child "as a result of Mr. Burden's emotional problems." That characterization is simply not correct. If Husband's illness did not impact Child in a harmful way, it would not, by itself, necessitate curtailing his custodial or visitation privileges. But Husband's illness *does* impact Child, as the above-stated facts clearly demonstrate.

The trial court, however, not only ignored these facts, but flatly contradicted them by stating that Husband has "a little emotional problem . . . and in effect, it is nothing. It doesn't amount to anything. . . . [T]hese emotional problems are of no consequence[.]" No support exists in the record for these statements, and ample evidence contradicts them, as detailed above. Moreover, the court effectively contradicts not just the evidence, but the statute itself, by stating categorically that Husband's emotional problems "are of no consequence in this litigation" and "should never even be referred to again." These statements cannot be squared with the statutory mandates of §§ 36-6-106(a) and 36-6-404(b) that the court "shall" consider the parents' mental health and emotional fitness. Again, the best interest of the child must be the court's top priority, and as such, the effects of any mental or emotional problems must be considered.

## E.

Another set of statutory requirements that the court appears to have ignored are the directives to consider "[t]he relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child," § 36-6-404(b)(2); "[t]he degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities," § 36-6-404(b)(6); and "[t]he love, affection, and emotional ties existing

---

[7] The trial court's brief memorandum opinion, largely devoid of evidentiary justification, stands in contrast with, *e.g.*, ***Niceley v. Niceley***, No. M2001-02182-COA-R3-CV, 2003 WL 1130010, at *6-7 (Tenn. Ct. App. M.S., filed March 14, 2003), in which the trial court's Permanent Parenting Plan order was upheld where "the trial court made extensive findings of fact" and it was "apparent from the order that the trial court listened attentively to all the evidence, drew factual conclusions, and weighed those conclusions."

between each parent and the child," § 36-6-404(b)(7).  Nearly identical language, ordered slightly differently, exists in §§ 36-6-106(a)(1), 36-6-106(a)(2) and 36-6-106(a)(10).  Nothing in the court's opinion suggests it considered these related factors, yet there was considerable evidence of a stronger relationship between Wife and Child than between Husband and Child, as well as abundant, undisputed evidence that the mother was the "primary caregiver" and was the primary performer of "parenting responsibilities"[8] prior to the divorce.

Husband acknowledged that, prior to the parties' separation, he spent "limited" time with Child during the bulk of the year.  He testified that he had "little interaction" with her on week nights because he generally either worked late or stayed out for a couple of hours after work before finally coming home so late in the evening that Wife and Child were already in bed or getting ready for bed.  Then in the mornings, it was Wife who helped Child "do whatever it is she needs to do to start a day," as Husband tacitly acknowledged on cross-examination (though he downplayed the significance of these parenting responsibilities, saying, "I don't think that was too hard").  Husband conceded that, when it came to Child's "health issues," it was "mostly" Wife who "did all that."  It was also Wife who bought most of Child's clothes, who participated in her extracurricular activities (which, as noted earlier, Husband almost never attended because of his panic disorder), and who took her on every vacation she has ever been on (excepting a trip to Dollywood with Husband's sister and mother, but not Husband).  Again, these facts were all revealed in Husband's own testimony.  In addition, the expert's report noted that "[Child's] description of daily activities prior to the separation seems to confirm that Mr. Burden had very limited involvement with her during that time and made little effort to foster a close relationship with her."  Husband also testified that even after the separation, it was his sister who would bathe Child and fix her hair during "his" weeks under the temporary parenting plan.

There is also considerable, albeit not undisputed, evidence that Child has a much closer emotional relationship with Wife than with Husband.  For example, the court's expert, Dr. Brietstein, wrote in his report:

_____

[8] The statute defines "parenting responsibilities" as: "those aspects of the parent-child relationship in which the parent makes decisions and performs duties necessary for the care and growth of the child. . . . [They] include:

(A) Providing for the child's emotional care and stability, including maintaining a loving, stable, consistent, and nurturing relationship with the child and supervising the child to encourage and protect emotional, intellectual, moral, and spiritual development;

(B) Providing for the child's physical care, including attending to the daily needs of the child, such as feeding, clothing, physical care, and grooming, supervision, health care, and day care, and engaging in other activities that are appropriate to the developmental level of the child and that are within the social and economic circumstances of the particular family;

(C) Providing encouragement and protection of the child's intellectual and moral development, including attending to adequate education for the child, including remedial or other education essential to the best interests of the child;

(D) Assisting the child in developing and maintaining appropriate interpersonal relationships;

(E) Exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances; and

(F) Providing any financial security and support of the child in addition to child support obligations."
T.C.A. § 36-6-402

On both visits, [Child] reported that she had a much closer relationship with her mother and had a more distant relationship with her father . . . . Even now, [Child] describes their relationship as distant, and she complains that her father does not allow her to interact with friends when she stays with him, has little to do during those visits, and spends most of her time with her aunt, whom she says yells a lot, and her grandmother, with whom she seems to have a better relationship.

* * *

The results of the evaluation indicate that [Child] has had a close relationship with her mother all of her life, and her mother has been the primary caretaker all along. In contrast, [Child] has had a limited relationship with her father who has been ambivalent about parenting and has failed to foster a close relationship with his daughter. While Ms. Burden can be criticized for having an overly close and somewhat enmeshed relationship with [Child] that may at times exclude her father, Mr. Burden has done very little to form a close relationship of his own, and, if anything, has distanced himself from his daughter by spending very little time with her.

Husband denies that his relationship with Child is distant, and further contends that, to whatever extent a rift may exist, it is Wife's fault for poisoning their relationship. Dr. Brietstein reached a different conclusion:

Mr. Burden blames his wife for the distance in his relationship with [Child], alleging that she kept [Child] away from him during the marriage and alienates her from him now. Yet, he admits that he never wanted to have children, remained angry at his wife for getting pregnant, moved out of the bedroom when [Child] was born, had little to do with her upbringing and never did return to his wife's bedroom. Mr. Burden also admits that he rarely took [Child] to any of her activities, did not assist with her homework, did not spend time with her on weekends and ate most of his meals at his mother's home, often returning home after [Child] was in bed. Furthermore, he admits that he was at times physically abusive to his Wife in [Child's] presence during the marriage, which he acknowledges may have contributed to [Child's] alleged fear of him. He also admits that he did not attend family vacations with [Child] because of his panic attacks and allowed some of his irrational fears to affect his parenting. As such, his claim that Ms. Burden kept [Child] from him during the

marriage and alienates her now appears inaccurate as the alienation appears to be more of his own doing.

The trial court is entitled to deference regarding Husband's testimony about his relationship with Child, but in exercising that deference, the court is required, as always, to keep the best interest of the child paramount. Moreover, as noted earlier, the court is *not* entitled to deference in its judgment regarding the weight and credibility of Dr. Brietstein's written report.

Conceding credibility to Husband's assertion as to Wife's participation in creating a rift, the evidence nevertheless preponderates in favor of a finding that Child has a much closer relationship with Wife and that other factors, unrelated to Wife's conduct, are primarily responsible for the deterioration in the relationship between Child and Husband.

In sum, there is abundant evidence that a consideration of the criteria listed in §§ 36-6-404(b)(2), 36-6-404(b)(6) and 36-6-404(b)(7), and their § 36-6-106(a) analogues, would weigh significantly in Wife's favor – yet the court does not appear to have considered this evidence at all in reaching its decision.

F.

One final set of statutory imperatives must be discussed: those relating to abuse. Sections 36-6-106(a)(8) and 36-6-404(b)(12) both state, in identical language, that the court must consider "[e]vidence of physical or emotional abuse to the child, to the other parent or to any other person." Moreover, § 36-6-406(a) mandates that "a parent's residential time as provided in the permanent parenting plan . . . *shall be limited* if it is determined by the court . . . that a parent has engaged in . . . [p]hysical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601." T.C.A. § 36-3-601(1) (emphasis added.) Note that a "pattern" of abuse is not required if the abuse is physical, but only if it is emotional. Section 36-3-601(1) defines "abuse" as "inflicting, or attempting to inflict, physical injury on an adult or minor by other than accidental means, placing an adult or minor in fear of physical harm, physical restraint, or malicious damage to the personal property of the abused party."

The court does discuss the issue of abuse in its opinion, but it is difficult to discern the basis on which the court concludes that the proven instances of abuse do not meet the standard for mandatory § 36-6-406(a) limitation. Nor does it seem, even disregarding § 36-6-406(a), that the court truly weighed this factor against the other §§ 36-6-106(a) and 36-6-404(b) factors in making a determination about the best interest of the child with regard to custody and the parenting plan. Where the opinion addresses the allegations that Husband abused Wife, the court prefaces the discussion by saying it is "[c]ommenting on their personal relationship," even though it is Child, not Husband or Wife, whose welfare is at issue. The opinion goes on to describe Wife as "no shrinking violet" and opines, "If you jumped on Ms. Burden you'd get as much or more than you handed out." She could, the court speculates, "cross swords with about anybody." None of these statements are

-14-

pertinent to an evaluation of Husband's proposed parenting plan or of his fitness as a custodial parent, which are supposed to be the subjects of the court's inquiry.

Nor is it pertinent to point out, as the court does at the end of its discussion of the abuse issue, that "I think that [Wife] was never injured and she can pretty much take care of herself." As already noted, "abuse" is defined under the relevant statute as "inflicting, *or attempting to inflict*, physical injury" (emphasis added). Therefore, the court's belief that Wife "was never injured" does not, by itself, support the conclusion that Husband's conduct is insufficiently abusive to necessitate mandatory parenting-time limitation under § 36-6-406(a) or that said conduct is outweighed by other factors under §§ 36-6-106(a) and 36-6-404(b).

Once the various irrelevant statements are disregarded, only a small fragment of the court's opinion relating to the abuse issue remains intact. That fragment states: "Mr. Burden may have been somewhat aggressive toward [Wife], and that is unfortunate if he was in the presence of this child." This equivocal statement tells us little about the court's reasoning, but if it means anything at all, it does not seem favorable to Husband.

Perhaps, however, the court based its ruling on its more general conclusion, stated earlier in the opinion, that Husband is "a totally harmless, gentle person. He is not overly aggressive." The court is certainly entitled to make credibility determinations based on observation in the courtroom. *See **Hartman v. Hartman***, No. E2005-02717-COA-R3-CV, 2006 WL 2482977, at \*4 (Tenn. Ct. App. E.S., filed August 29, 2006) ("the trial court has the benefit of observing the parties' demeanor and assessing credibility first hand"). However, the court cannot simply disregard the weight of the evidence of a substantive issue on the basis of nothing more than its own conclusory statements regarding a party's character. Whether or not the court believes Husband is "totally harmless" and "gentle," it is still required to duly consider the evidence that he committed abuse of the sort that would affect the outcome of the case under §§ 36-6-406(a), 36-6-106(a) and 36-6-404(b). This includes, in addition to what has already been mentioned, Wife's uncontradicted testimony that Husband verbally abused her, calling her a "fat ass bitch, or a fucking bitch ... lazy, no good, good for nothing, a bad mother, a bad teacher, a bad person." Especially in light of the irrelevant considerations apparently relied upon by the court in disposing of this issue (i.e., the lack of injury to Wife and the court's opinion that she is "no shrinking violet," could "cross swords with about anybody," and "can pretty much take care of herself"), we do not believe the court's judgment on this point is adequately supported by the facts and the law.

G.

Finally, we return to the expert's report. It bears repeating that no evidence was introduced questioning Dr. Brietstein's qualifications or credibility. Indeed, there appears to have been no dispute prior to the receipt of Dr. Brietstein's report that he is eminently qualified. Husband asked the court to appoint a psychologist, and did not object to the appointment of Dr. Brietstein. Wife's counsel stated at the August 30, 2004, hearing that he is "the Chairman of the Committee that wrote the Child Custody Evaluation Guidelines." The court's opinion acknowledges this point, noting that

Dr. Brietstein is, "according to counsel, a talented individual and has kind of written the book on some of these records."

Nor was any opposing expert testimony or report offered. It is well established that "[w]hen expert testimony differs, it is within the discretion of the trial judge to determine which testimony to accept." *Bohanan v. City of Knoxville*, 136 S.W.3d 621, 624 (Tenn. 2004). This, however, is not a case where a "battle of the experts" occurred and the judge believed one over the other, or chose to believe one expert on some points and the other expert on some other points. Instead, this is a case where an expert's opinion was solicited by Husband, jointly agreed to by both parties and the court, entered into the record as a written report without objection from anyone, and now stands uncontradicted and unrebutted, the only expert evidence in this case – yet the report's central conclusions were rejected by the court for no other reason than "I don't like this one. I don't like the way it is done. I don't like the results."

While it is true that "[e]xpert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony," *Thurmon v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001), the court still must have *some* valid evidentiary basis for its contrary conclusions. It must "decide the issue upon its own fair judgment, assisted by the expert testimony," *Gibson v. Ferguson*, 562 S.W.2d 188, 190 (Tenn. 1976), and may reject the testimony "if it finds that it is inconsistent with the facts in the case or otherwise unreasonable." *Cocke County Bd. of Highway Comm'rs v. Newport Util. Bd.*, 690 S.W.2d 231, 235 (Tenn. 1985) (quoting 31 Am.Jur.2d *Expert and Opinion Evidence* § 138 (1967)). Here, the problem is not simply that the court disagreed with the expert; it is that the court adopted a viewpoint not only diametrically opposed to the expert's, but unsupported by the weight of the evidence.

It is also crucial to note again that we are dealing here with an expert *report*, not with an expert's in-person *testimony*, as in the cases just cited. Thus, we need not defer to the trial judge's determinations regarding weight and credibility, "since we are in the same position as the trial judge." *Krick*, 945 S.W.2d at 712.

The only testimony of a non-party offered by Husband that could perhaps be viewed as a rebuttal of Dr. Brietstein's report is that of the late Judge Lee Asbury, a longtime Burden family friend, and that of Husband's father. Judge Asbury testified that he would not have any hesitation leaving children with Husband. Judge Asbury, however, was a general character witness, not a psychology or childrearing expert, and his firsthand knowledge of Husband's interactions with Child was very limited, as revealed on both direct examination and cross-examination. There was also testimony by Husband's father, Harry Burden, that the relationship between Husband and Child was "as good as one could ever hope for." Yet he too lacks Dr. Brietstein's expertise, and also had limited knowledge of what happened in his son's home. Still, Dr. Brietstein had testified in person, the trial court would have been entitled to deference in its weighing of the doctor's testimony against that of the two witnesses. However, because Dr. Brietstein's report is nothing but the "cold printed word," *Deitmen*, 1986 WL 6057 at *1, we may draw our own conclusions from the record. We

conclude that Dr. Brietstein's report is credible, and that as between the report on the one hand, and the testimony of Judge Asbury and Mr. Burden on the other hand, Dr. Brietstein's report is significantly more probative.

Dr. Brietstein's conclusions were, as noted already, quite straightforward. He described in detail Husband's psychological problems and their effects on Child, Husband's limited involvement in parenting responsibilities both before and after the separation, and his distant relationship with Child. For instance, in addition to the passages already quoted herein, Dr. Brietstein wrote:

> Both parents agree that the mother, Anna Burden, has been the primary caretaker for [Child] throughout the marriage. While both parents work, Ms. Burden has performed the primary parenting responsibilities including getting [Child] ready for school, preparing her meals, taking her to after-school activities and doctor's appointments, helping her with her homework, and helping her get ready for bed. Mr. Burden's role, on the other hand, has been much more limited, although he has participated in play activities with [Child]. While his role has expanded during the separation, [Child's] visitation with her father takes place in her aunt's home, Mr. Burden's sister, and her aunt along with her grandmother perform many of the parental duties during Mr. Burden's co-parenting time.

> \* \* \*

> Ms. Burden has always been a dedicated parent, and it is evident that her relationship with her child is first and foremost in her life. She always has been [Child's] primary caretaker, and Mr. Burden's role has always been secondary, even by his own account. At the same time, it might be said that Ms. Burden maintains an overly close relationship with [Child], with whom [Child] has slept all her life, at least until the recent separation. While Ms. Burden claims that her sleeping with [Child] was Mr. Burden's preference rather than her own, it is likely that Anna has not fully encouraged [Child] to sleep alone. Nor has she fully encouraged [Child] [to establish] independence from her.

> \* \* \*

> From a psychological standpoint, there is no indication that Ms. Burden suffers from any mental or psychological disorder, and unlike Mr. Burden, she has no history of mental problems or mental health treatment.

\* \* \*

Mr. Burden's [relationship with his family] seems unusually close to the point of being dependent upon them. . . . [H]e is particularly dependent upon his mother and sister who assist in caring for [Child], and based on [Child's] description, they seem to provide the bulk of the parenting during his co-parenting time.

\* \* \*

Mr. Burden also has irrational fears of losing control and harming other people . . . These obsessions or irrational fears, for which he has been diagnosed with Obsessive Compulsive Disorder, include a fear of poisoning other people, particularly [Child] whom he would not allow to take lunch to school or bring her book bag into the home for that reason. . . . [I]t is likely that his reluctance to be alone with [Child] is an outgrowth of these irrational obsessions.

\* \* \*

[Child] was . . . observed on two occasions, once with her mother and once with her father. With her mother, [Child] appeared relaxed, and there was an easy flow of conversation between the two. On the other hand, her father appeared to be at a loss when asked to suggest an activity for the two of them to do together. Furthermore, he seemed to have difficulty sustaining a conversation with [Child], and the evaluator had to often intervene to keep the conversation going. As such, it was fairly evident that Mr. Burden is not entirely comfortable interacting with his daughter. On the other hand, there was little or no sign of discomfort between [Child] and her mother, despite the fact that the setting was the same.

On the basis of these and other conclusions, Dr. Brietstein recommended that the current arrangement, which he described as ill-suited to this family and harmful to Child, be replaced with an arrangement whereby Wife is the primary residential parent and Husband's co-parenting time is limited to "visitation every other weekend and one day during the week" with "more extended visitation during the summer, as much as four weeks, although this should be divided into two week intervals." In essence, this is Wife's proposed Permanent Parenting Plan, which was subsequently rejected by the court in favor of Husband's plan, even though Dr. Brietstein described the latter as "causing more harm than good."

The court, however, took something very different away from its reading of Dr. Brietstein's report. Despite rejecting the report's basic conclusions because "I don't like the results," the court heavily referenced the portions of the report that criticize Wife for, in the court's words, her "very strong overpowering relationship with this child." It is indeed true that Dr. Brietstein discussed that issue and concluded, "it might be said that [Wife] maintains an overly close relationship" with Child. However, it could hardly be more clear that this was Dr. Brietstein's secondary concern. Contrary to the court's statement that the report "went on and on and on" about the problems in the mother-daughter relationship, the report addresses those problems in far less detail than it does the problems in the father-daughter relationship – which the court did not even discuss in its opinion. It appears that the court engaged in unjustified judicial "cherry-picking" of the expert report, crediting those portions where it "like[d] the results" and discrediting the rest, with no valid evidentiary basis for doing so.

It is neither surprising nor dispositive that the relationship between Wife and Child is less than perfect. As noted in **Bah v. Bah**, 668 S.W.2d 663 (Tenn. Ct. App. 1983),

> Fitness for custodial responsibilities is *largely a comparative matter*. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others.

**Bah**, 668 S.W.2d at 666 (emphasis in original) (quoting **Edwards v. Edwards**, 501 S.W.2d 283, 290-91 (Tenn. Ct. App. 1973)).

In this case, as in most, neither spouse is a perfectly fit custodian. However, the evidence clearly preponderates in favor of the conclusion that Wife is more fit than Husband. The court's support for the contrary view consists largely of bare assertions unsupported by the record: that Husband is a "totally harmless, gentle person," that he "would be a totally good parent," that his concededly serious mental illness is "a little emotional problem" that "is nothing" and "doesn't amount to anything," and so forth. These assertions simply are not enough to sustain the court's ruling.

For all of the foregoing reasons, we hold that the trial court's ruling regarding custody and the permanent parenting plan is contrary to the weight of the evidence. Accordingly, we reverse.[9]

---

[9] We decline to rule on the issue, raised by Wife, of whether the trial court abused its discretion in failing to grant Wife's motion to reconsider and/or in failing to hear Dr. Brietstein's testimony after issuing its ruling. These issues are rendered academic by our holding that the court's ruling is contrary to the evidence that was presented at trial. We also decline to rule on whether the allegations of abuse against Husband trigger § 36-6-406(a)'s provisions mandating a limitation of parenting time. Because the provisions of §§ 36-6-106(a) and 36-6-404(b) provide a sufficient basis to decide this issue, there is no need to decide the § 36-6-406(a) question.

H.

Wife is hereby declared the primary residential parent of Child, subject to the visitation schedule for Husband set forth in Wife's Permanent Parenting Plan, which plan we adopt. If Child is with Father on the day this opinion is released, Child will be transferred to custody of Mother on the day following release of the opinion. Husband's first Tuesday under the new Permanent Parenting Plan will be October 2 and his first weekend will be October 5-7.

III.

A.

"A trial court has wide discretion in dividing the interest of the parties in marital property." *Payne v. Payne*, No. E2006-02467-COA-R3-CV, 2007 WL 2668588, at *4 (Tenn. Ct. App. E.S., filed September 12, 2007). "Accordingly, the trial court's distribution will be given great weight on appeal, and will be presumed to be correct unless we find the preponderance of the evidence is otherwise." *Barnhill v. Barnhill*, 826 S.W.2d 443, 449 (Tenn. Ct. App. 1997) (citations omitted). Moreover,

> The trial court's goal in every divorce case is to divide the parties' marital estate in a just and equitable manner. The division of the estate is not rendered inequitable simply because it is not *mathematically equal. . . .* In the final analysis, the justness of a particular division of the marital property and allocation of marital debt depends on its *final results*.

*Payne*, 2007 WL 2668588, at *4 (quoting *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App.1998)) (emphases added).

Wife argues that the trial court erred in its distribution of the marital estate by not charging Husband with the value of his gun collection. The court held:

> On his guns, guns are a personal item, and of course, is a marital asset as is jewelry and personal items of a woman. Courts don't always give the guns the full value nor the jewelry, those are personal matters, and I kind of think that's a little offset in this case.

Wife asserts that Husband's gun collection is worth significantly more than Wife's jewelry, and as such, the court's "offset" logic is inappropriate.

The parties largely agree in their interpretations of the trial court's accounting with regard to their respective shares of the marital property: the court awarded $101,850 to Husband and

$42,700 to Wife, not including their respective shares of the auction.[10] To equalize these shares, the court awarded Wife an additional $50,000 "off the top" of the auction proceeds. The remaining $90,516 from the auction was ordered to be split equally between the parties. This results in a total distribution of $147,108 to Husband and $138,258 to Wife.

Assuming *arguendo* that Wife is correct, and the court erred in declining to assign values to the guns or jewelry, the "final result" of the distribution would nevertheless be equitable. Even if we accept Wife's asserted value for Husband's gun collection – $10,600 – while assigning zero value to Wife's jewelry, Husband's resulting distribution would be $157,708, while Wife's would remain $138,258. These figures, although not "mathematically equal," are well within the range of the trial court's broad discretion in determining the equitable division of marital property.

B.

Wife also argues that Husband should be charged for taking funds out of the marital estate in anticipation of divorce. She makes two related claims: that he dissipated their checking account by approximately $39,500 during the period between retaining his divorce attorney and filing for divorce;[11] and that he failed to deposit at least $3,200 of paychecks into the account during the same period. The court held:

> [T]his Court did not assume that because counsel says there's dissipated funds and that there's fraud involved that that's necessarily so. The proof is just not here as to exactly what happened. You can surmise, you can guess, you can think, well, there might be a shoe box somewhere [containing cash] and there might be, who knows.

"The burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation, and that party retains throughout the burden of persuading the court that funds have been dissipated." ***Wiltse v. Wiltse***, No. W2002-03132-COA-R3-CV, 2004 WL 1908803, at *4 (Tenn. Ct. App. W.S., filed August 24, 2004) (quoting 24 Am. Jur. 2d *Divorce and Separation* § 560 (1998) (citations omitted)). A party alleging dissipation cannot meet her burden simply by arguing that "since she does not know how the money was spent, dissipation must have

---

[10]Both parties say the court valued its award to Husband at $90,000, and both agree that the Jeep Cherokee and Mitsubishi Lancer, which have an agreed value of $11,850 combined, were awarded to Husband as well, for a total of $101,850 (although the court inexplicably did not include the Jeep and Mitsubishi when it tallied up the awards). The only disagreement is over the proper accounting of the court's award to Wife. Wife says the court valued its award to her at $42,700. Husband claims that this total is based on a mistake by the court in its accounting for the value of Wife's Nissan Quest — that the court meant to tax Wife with $25,000 for the Quest, rather than $5,000 — and therefore the proper total would be $62,700. However, it is apparent to us that the court subtracted Wife's outstanding debt on the Nissan, approximately $20,000, from the Nissan's value, approximately $25,000, to arrive at the $5,000 figure it announced. Therefore we adopt Wife's figure of $42,700.

[11] Wife actually puts the dissipation at $46,617.04, but once the approximately $7,000 remaining in the account at the time of trial is subtracted out, the amount in controversy is reduced to approximately $39,500.

occurred." ***Kesterson v. Kesterson***, No. W2004-02815-COA-R3-CV, 2006 WL 16309, at \*7 (Tenn. Ct. App. W.S., filed January 4, 2006).  It is also important to differentiate between "dissipation and discretionary spending." ***Wiltse***, 2004 WL 1908803 at \*4.  "Trial courts must distinguish between what marital expenditures are wasteful and self-serving and those which may be ill-advised but not so far removed from 'normal' expenditures occurring previously within the marital relationship to render them destructive." ***Id.***

At the center of this dispute is the parties' Home Federal checking account, which was in Husband's name only, but is acknowledged by both parties to be a marital asset.  The evidence shows that the account balance decreased from $46,417.04 on July 28, 2003, the day he retained his divorce attorney, to approximately $7,000 at the time of trial in May 2005; that some, but not all, of this shortfall is the result of Husband's attorney fees; that $25,882.20 was spent on expenses related to Husband's "moonlighting" job repairing and reselling used cars during the period in question; and that Husband rarely if ever deposited his moonlighting earnings into the account during this period.  Husband testified at trial that he kept the moonlighting earnings in cash, stored them in his billfold or "in the house somewhere," and spent them "here, there and yonder" on food, clothes and other expenses.  He later said that he "can't remember what I spent all that on," but that he no longer has any of it.

With regard to the attorney's fees, the trial court taxed Husband with $25,000 in its distribution of the marital estate, based on Husband's estimate that he had paid his divorce attorney $25,000 out of the Home Federal account.  As for the rest, the facts in the record are not sufficient to establish that Husband fraudulently dissipated the account in anticipation of divorce.  Wife presents no evidence of where the "moonlighting" income went, but suggests that it was stashed away somewhere for Husband's personal use, with deliberate intent to deprive Wife of access to it after the divorce.  As the trial court said, we cannot reach such a conclusion by "surmise" or "guess," especially in light of Husband's contrary testimony.  The burden to prove dissipation is on Wife, and she has not met it.  Moreover, a review of Husband's checking account statements from December 2002 through May 2003 indicates that Husband routinely took money out of his checking account for moonlighting expenses but did not deposit moonlighting income back into the account.[12]  It is not for this court to pass judgment on the wisdom on the parties' financial practices; for our purposes, it is sufficient to note that this practice did not originate in July 2003, as Wife suggests, but in fact long pre-dated the engagement of his divorce attorney.  In any event, the trial court was correct that "the proof is just not here" to support a claim of dissipation.

Nor is it necessarily damning that Husband did not deposit eight of his regular paychecks into the account from September through December of 2003.  Again, nothing in the record indicates that the money from those paychecks was stashed away or otherwise disposed of improperly, and we will not "surmise" or "guess" that this occurred.  The court was well within its broad discretion to believe Husband's testimony that these paychecks were spent on legitimate expenses. Especially given the sometimes "off the books" nature of Husband's moonlighting business, this conclusion is not

---

[12] During this time period, Husband used a Union Planters account.  He switched to Home Federal in May 2003.

patently unreasonable, and the court is entitled to reach it based on its weighing of all the evidence, including the credibility of the witnesses. We decline to disturb the court's holding on these issues.

IV.

With regard to alimony, the court's denial was not based on a weighing of the evidence or an analysis of the substantive issues. Rather, it was a refusal to even consider the issue, as reflected in this exchange with Wife's attorney:

> THE COURT: . . . Anything I've overlooked?

> MS. CRANDALL: The wife did have a claim for alimony, Your Honor. Of course, it would only be transitional alimony or lump sum alimony to assist her in setting up her house.

> THE COURT: I've not heard any proof on alimony. I'm not going to rule on alimony one way or the other at this point.

> MS. CRANDALL: Does that mean it's in abeyance or does that mean – for the record, when you said you're not going to rule on it one way or the other, does that mean you're saying I'm denying or does that mean you're saying I'm putting it on hold and I'm not doing it today?

> THE COURT: You can't just tell me we're asking for alimony. You have to prove you're entitled to it under the law. Your guess is as good as mine what I would do in this case. Your client is a well-educated, attractive young lady working as a school teacher. You might convince me to grant alimony but not likely. I mean as far as that, you have to prove it.

> MS. CRANDALL: All I could do at this point, Your Honor, is to argue it. We did bring it up in the trial, we submitted her affidavit, we've done all that. Of course, it would be our position, understanding that the law favors alimony in gross versus some type of periodic month-to-month alimony, that's what we would be seeking preferably would be alimony in gross. That would enable her to transition out of this marriage and allow her to re-establish a home and re-establish herself financially. Because if the Court does look at her income as compared to his, there's about a twenty thousand dollar plus a year difference, if the Court looks at what it was prior to the divorce starting. Because then suddenly the income did drop. But we did submit that proof for Your Honor.

> THE COURT: The Court denies alimony. Anything else?

-23-

The court's assertion that "I've not heard any proof on alimony" is incorrect. There was extensive testimony at trial about the parties' respective levels of income and financial need. In addition, Wife submitted written evidence regarding her income and expenses, and although Husband submitted no written evidence of his expenses or income (aside from a child-support worksheet which he testified was based on his 2004 and 2005 income), Wife submitted written evidence of Husband's income up until 2003.

Nor was it accurate for the court to say that Wife "just [told] me we're asking for alimony." This was not a last-minute request by Wife. In her answer and counterclaim for divorce, filed on June 30, 2004, Wife averred:

> 4.11 That the Husband is employed through his family and historically has had a greater earning capacity than Wife.
>
> 4.12 That Wife has made significant contributions to the marriage and home by serving as the primary caretaker of the child, primary homemaker and a wage earner.
>
> 4.13 That the Wife has enjoyed a standard of living during the marriage and as the non-faulting or least faulting party she shall not be left in a worse financial condition because of these proceedings.
>
> 4.14 That the Husband has the ability to provide for the support of the Wife.
>
> 4.15 That considering the length of the marriage and all other relevant factors, Wife is entitled to an award of alimony.

Husband responded to these averments in his answer to Wife's counterclaim on July 6, 2004, denying each of them except 4.11, about which he said, "It is admitted that Plaintiff may have had greater earnings than the Defendant in the course of the marriage; but the Defendant's capacity to earn is as [sic] greater than that of the Plaintiff." Wife then proceeded to make the case at trial that her averments were correct.

In sum, the issue of alimony was duly raised in the pleadings, and the evidence necessary to a determination was introduced at trial. Wife did indeed attempt to "prove [she is] entitled to it under the law." Whether she succeeded is for the trial court to determine, but the court abused its discretion by summarily refusing to even consider the facts on the basis of its incorrect belief that the issue had not been adequately raised.

We therefore remand the case for a full and complete hearing on the issue of alimony, so that the trial court, guided by the dictates of T.C.A. § 36-5-121(i) and other relevant law, can reach a decision based on a fair and thorough weighing of all the evidence in the record, as well as any

additional evidence the parties may wish to introduce. In doing so, the court should ensure that neither party is unfairly disadvantaged by the other party's failure to produce relevant documentary evidence bearing on the § 36-5-121(i) factors.

V.

In summary, we hold that the judgment of the trial court is reversed in part, affirmed in part, and vacated in part, as more fully set forth in the body of this opinion. Wife is hereby declared to be the primary residential parent of Child, subject to Husband's visitation rights as set forth in Wife's Permanent Parenting Plan which is adopted by us. This case is remanded to the trial court for further proceedings, but only as to the issue of alimony, pursuant to the instructions contained in this opinion. Costs on appeal are taxed to the appellee, Harry Donald Burden.

_____
CHARLES D. SUSANO, JR., JUDGE