IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 2019 Session

**APRIL R. BURCHFIELD v. D. RYAN BURCHFIELD**

**Appeal from the Circuit Court for Overton County**
**No. 2014-DV-9      Amy V. Hollars, Judge**

_____

**No. M2017-01326-COA-R3-CV**

_____

Mother filed a petition for modification of the residential parenting schedule in a permanent parenting plan. Father filed a counter-petition for modification of the permanent parenting plan seeking designation as the primary residential parent of the parties' two children. After a hearing, the trial court granted Mother's petition and reduced Father's parenting time by thirty-seven days based on conduct by Father that necessitated limiting his residential parenting time. Father appealed. We affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, D. Ryan Burchfield.

Melanie Stepp Lane, Jamestown, Tennessee, for the appellee, April R. Burchfield.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

April R. Burchfield Neff[1] ("Mother") and D. Ryan Burchfield ("Father") are the parents of two children, Landon (born in December 2006) and Paisley (born in September 2011). In the final decree of divorce entered on December 17, 2014, the trial court granted the parties a divorce on the ground of irreconcilable differences and approved their permanent parenting plan and marital dissolution agreement ("MDA"). The permanent parenting plan designated Mother as the primary residential parent and provided Father with 141 days of parenting time per year. Father had parenting time with

---

[1] Mother remarried during the trial of this matter and changed her surname to "Neff."

the children every other week from Wednesday at 4:30 p.m. until Sunday at 4:30 p.m. and every other Wednesday from 3:00 p.m. until Thursday at 5:30 p.m. Father also had parenting time during: (1) alternating holidays, (2) fall and spring vacation every odd-numbered year, (3) part of winter vacation, and (4) one week every summer "upon giving 30 days notice." The parenting plan provided for joint decision-making.

Following entry of the final decree, conflict between the parties significantly increased, especially during custody exchanges. For instance, on March 20, 2015, the parties met in the parking lot of the Overton County Justice Center to exchange custody. After transferring the children into Mother's vehicle, the parties began arguing with one another. Mother got into her vehicle to leave, and Father remained standing next to the passenger side of the vehicle. As Mother started to drive away, Father punched the back passenger door of the vehicle, which dented the vehicle's door.

Mother filed a petition for an order of protection against Father based on this incident. After being served with the petition, Father went to the Overton County Sheriff's Department and requested that the department charge Mother with vehicular assault because, as she was driving away on March 20, 2015, she attempted to run over him. The sheriff's department declined to press charges against Mother due to a lack of evidence. Father then swore out a criminal summons against Mother on April 2, 2015, claiming that he struck Mother's vehicle because she was driving aggressively and almost hit him.

After viewing a surveillance video of the March 20, 2015 incident, the Overton County General Sessions Court found that Father's account of events was inconsistent with the video and granted Mother's request for an order of protection. The court further found that Father engaged in conduct meant to inflict emotional harm on Mother and that his conduct "constitute[d] abuse as defined in Tenn. Code Ann. 36-3-601; specifically, he struck [Mother's] vehicle in a malicious manner, attempting to, and actually causing damage to the vehicle."[2] Finally, the court concluded that Father "sought a criminal summons against [Mother] vindictively." Father did not appeal the general sessions court's decision.

On March 26, 2015, Mother filed a petition to modify the parenting plan in the Circuit Court for Overton County, alleging that a material change in circumstances had

---

[2] Tennessee Code Annotated section 36-3-601(1) defines abuse as:

> [I]nflicting, or attempting to inflict, physical injury on an adult or minor by other than accidental means, placing an adult or minor in fear of physical harm, physical restraint, malicious damage to the personal property of the abused party, including inflicting, or attempting to inflict, physical injury on any animal owned, possessed, leased, kept, or held by an adult or minor, or placing an adult or minor in fear of physical harm to any animal owned, possessed, leased, kept, or held by the adult or minor.

occurred justifying a modification of the residential parenting schedule. Specifically, she alleged that Father engaged in conduct that constituted a pattern of emotional and psychological abuse, failed to substantially perform his parenting responsibilities, and used conflict abusively. Mother requested that the court reduce Father's parenting time to 52 days per year because his conduct was adversely affecting the children. Mother also requested that she be allowed to enroll the children in Pickett County schools because she had accepted a teaching position in Pickett County.

Father filed an answer and amended answer denying all allegations of misconduct. On July 28, 2015, he filed a motion to prevent Mother from removing the children from Overton County schools because she had not submitted the issue to mediation as required by the MDA. The trial court entered an order on August 12, 2015, allowing Mother to enroll the children in Pickett County schools pending a final hearing on Mother's petition to modify. Consistent with this order, Mother enrolled Landon in school in Pickett County and enrolled Paisley in Pickett County's Head Start program. On two occasions following entry of the court's order, however, Father took Paisley to daycare in Overton County rather than to Head Start. Mother filed a motion to compel Father to take Paisley to Head Start and, on October 26, 2015, the court entered an order permitting Father to take Paisley to daycare in Overton County "when necessary due to his work schedule."

After an initial round of discovery, Father filed a counter-petition to modify the parenting plan, requesting that he be designated the primary residential parent and that the parties have equal parenting time with the children. He alleged the following material changes in circumstances that warranted a modification: (1) Mother misled the court in her pleadings to enroll the children in Pickett County schools by alleging that Landon struggled emotionally and academically; (2) Mother attempted to prevent Father from obtaining information pertaining to the children's educational programs; (3) Mother enrolled Landon in counseling without either conferring with or advising Father and then discontinued the counseling against the advice of the counselor; and (4) Mother exercised poor judgment in allowing Joseph King, a man with a criminal history, to care for the children unsupervised.

Father also requested that the court find Mother in contempt for registering Paisley in Head Start without Father's authorization or a court order and for violating the parenting plan by failing to include Father's information when she registered Landon at Picket County Elementary. Finally, Father asked the court to find that Mother "fraudulently and maliciously" provided erroneous information on the Pickett County Head Start application and "intentionally and maliciously" interfered with Father's relationships with the children.

The trial of this matter occurred over the course of eight months on the following ten days:  June 24, 2016; July 29, 2016; August 1, 23-24, 2016; September 13 and 19, 2016; and October 10, 2016.  The court heard testimony from several witnesses including Mother, Father, the children's teachers, and Landon's counselor.

The first witness to testify on behalf of Mother was Sharon York.  Prior to retiring in February 2016, Ms. York worked as the center supervisor at Head Start in Pickett County.  Regarding Paisley's Head Start application, Ms. York testified that she and Mother had busy schedules in 2015, which prevented them from meeting to complete the application before the center closed for the summer.  Ms. York informed Mother that, if she brought copies of "her taxes, her birth certificate, her address, and the three emergency contact numbers," Ms. York would complete the application for Mother and then bring it back for Mother to sign.  After obtaining the requisite information from Mother, Ms. York completed the application, but she intentionally entered Mother's income as a lower amount than what was reported on Mother's 2014 tax return because Mother's income was too high for Paisley to be eligible for Head Start. Ms. York testified that she falsified Mother's income out of concern for Paisley:  "nine times out of ten . . . the children out of divorce cases . . . they need some extra help.  They need extra.  You know and I did it."  Ms. York further testified that she took the completed application to Mother, and Mother signed the application without reading it.  Ms. York acknowledged that she neither encouraged Mother to read the application nor informed her of the falsified income information.

Ms. York also testified about Paisley's attendance record at Head Start.  During the 2015-16 school year, Paisley was absent thirty-nine days.  According to Ms. York, most of Paisley's absences occurred on days when Father exercised parenting time.[3]  Ms. York testified that, "at first [Father] would bring her, and then it got to where he didn't bring her on the days that he had her.  Whenever Mother had her, . . . she only missed one day on a Monday and she was sick."

Diane Elder also testified on behalf of Mother.  Ms. Elder was the director of schools in Pickett County, where Mother worked.  She testified that she received an anonymous phone call from a man claiming that Mother had committed fraud.  At the time she received the call, Ms. Elder did not recognize the voice.  When she met with Mother about the phone call, Mother played her a voice mail message left by Father.  After hearing Father's voice, Ms. Elder identified Father as the anonymous caller.

Michael Neff, Mother's current husband, testified next on behalf of Mother.  At the time of trial, Mr. Neff and Mother had dated for seven months.  During the spring of

---

[3] When Mother enrolled Paisley at Head Start, she provided a copy of the parenting plan.

2016, Mr. Neff attended some of Landon's baseball games. He described the following encounter he had with Father at one of the baseball games:

> A. Somebody had a puppy there and [Paisley] was walking it around and stuff.
> Q. Okay.
> A. She was wrapping [the puppy's leash] around my finger. [Father] had come down off of the bleachers and jerked her up from out in front of me and says, "You don't need to be around my kids until you know them as well as I do."
> Q. Okay.
> A. I said, "That's the third time." [Father] said, "This is number four." I said, "This ain't the time or place for this." And he said, "Name your time and place."

Mr. Neff then testified about Father's behavior during another one of Landon's baseball games:

> A. [Mother] had asked for Paisley to sit down on the bleachers just to watch her brother and cheer for her brother, getting used to being there and part of it. Asked [Father] not to take [Paisley] to the playground, and he had proceeded to take her over there any way. Then they'd come back and them two had gotten talking at the time. I didn't see nothing out of the way, just talking.
> Q. You said, "Them two" who?
> A. [Mother] and [Father].
> Q. Were talking okay.
> A. They were just talking. Paisley went down and sat by [Father] and then come back to [Mother]. And [Mother] told him, you know, I'd really appreciate if you'd respect what I want so we can teach Paisley to support her brother. And he had committed (sic) to walking across saying, "I don't have to respect anything you want. I'm here for the kids." He said that about four or five times.

According to Mr. Neff, Father followed him after leaving two of Landon's baseball games. Finally, when asked if he had ever used any illegal drugs, Mr. Neff responded that he had smoked marijuana when he was sixteen years old.

Debbie Beaty, the maternal grandmother, also testified on behalf of Mother. She stated that, when the children resided in Pickett County but still attended school in Overton County, Landon would sometimes cry and express a desire not to go to school. According to Ms. Beaty, Landon explained that he felt that way because "the work was harder. He had a lot of homework, and travel." She also testified about statements

Father had made to Landon. Specifically, she stated that Landon mentioned to her that Father "said that he wished [Mother] was dead and he wished that he could kill her."

Mother also testified at trial. She stated that, shortly after entry of the final decree, Father began behaving inappropriately when the parties exchanged custody of the children. On February 18, 2015, Mother arrived with the children at the Overton County Justice Center. She stated that she parked in the lower section of the parking lot that day rather than in the upper section where she usually parked because there was snow and ice on the ground. She believed the lower section would be safer for the custody exchange because there was gravel in that area. Mother explained that, at that time, she was concerned about safety precautions because Landon had recently broken his arm. When Father arrived, he parked in the upper section where the parties usually exchanged the children. Mother testified that she sent Father a text message informing him that she had parked in the lower section and explaining why she had parked there. Father refused to drive down to where Mother was parked and insisted that she drive to where he was. Mother stated that, when she did not drive to where Father was parked, he exited his vehicle and acted as follows:

> A. He starts jumping up and down in the snow. I guess he was cold and then he picks up snow and makes snow balls and starts to throw them. Throw some at my Jeep.
> Q. Did he hit your Jeep?
> A. Yeah.
> . . . .
> Q. What did he do next?
> A. At one point he laid down in the snow and made snow ang[els] in the snow.

According to Mother, she then drove to where Father was parked, and she saw him make a celebratory hand gesture.

Mother testified that Father also acted inappropriately during a custody exchange on March 5, 2015. Mother's father, Junior Beaty, accompanied her to the exchange because the roads were hazardous due to a recent accumulation of snow. As Father arrived with the children, he saw Mr. Beaty in Mother's car. Mother stated that Father then pulled away and began "shaking his finger at [her] like no, no, no." When she called and asked him why he did not stop, Father informed her that he would not exchange the children if Mr. Beaty was present. He then told Mother that she would have to get a warrant to make him return with the children. Upon the request of Mother, a deputy from the Overton County Sheriff's Department intervened and informed Father that a warrant could be arranged if he did not return with the children. Thereafter, Father returned and delivered the children to Mother.

Mother next testified about the March 20, 2015 incident when Father punched her vehicle. She stated that, at the beginning of March she enrolled Landon to play baseball in Pickett County because he told her that was where he wanted to play. According to Mother, she then notified Father that she had enrolled Landon to play baseball in Pickett County. During the March 20, 2015 custody exchange, Father informed Mother that he had enrolled Landon to play baseball in Overton County. Mother testified that she and Father then transferred the children to her vehicle and began to argue. She informed Father that she did not want to argue and returned to her vehicle. As she began to drive away, Father punched her rear passenger door. Mother stated that "Paisley was screaming because it scared her so bad." Mother testified that, as of trial, Paisley continued to mention this incident.

Mother testified that Father began acting inappropriately at times other than during custody exchanges. For instance, he followed her on several occasions after the parties exchanged the children. On one occasion, Father went to the school where Mother worked and called her a "f***ing b***h" in front of Landon. Mother stated that, during one of Landon's baseball games, she approached Father with Paisley in her arms and asked him "to help [her] and respect what [she] was trying to teach the kids. And he said, 'I don't have to respect you.'" Father then grabbed Paisley's arm. According to Mother, Paisley started crying and said, "Daddy hurt my arm."

Regarding Paisley's attendance at Head Start, Mother testified that she missed thirty-nine days, but only three of those absences occurred during Mother's parenting time. Paisley also missed her graduation from Head Start, which occurred during Father's parenting time. Aware that the ceremony would occur during Father's parenting time, Mother offered to take Paisley to the ceremony and then return her to Father afterwards because Paisley had expressed a desire to attend. Father replied that "he would have to think about it." Mother testified that she sent Father a text message several days later making the same offer, but she never received a reply. According to Mother, she did not pick Paisley up from daycare in Overton County and take her to the graduation ceremony without Father's permission because she feared that he would call the police.

Mother testified that she informed Father that she wanted to enroll Landon in counseling, but Father "didn't want to do it. He didn't think it was a good idea." Although Mother did not have Father's consent, she enrolled Landon in counseling with Sheila Masters. Mother stated that she felt proceeding with the counseling was her only option because she believed Landon was having trouble coping with the divorce. He did not eat or sleep well and had become moody and "very emotional." After enrolling Landon in counseling, Mother learned that Father had been attending separate family counseling with both children. She testified that the separate family counseling did not bother her. Rather, she was upset that it appeared that Father "was trying to be secretive" about it.

Mother also testified that Paisley was aware of the conflict between the parties. She stated that Paisley expressed concern that Father had a picture of Mother and Mr. Neff on his phone. According to Mother, Paisley told her she was confused about the picture "[b]ecause daddy doesn't like you."

Mother stated that there is very little communication between the parties. She stated that the children "miss out on things," such as Paisley's Head Start graduation ceremony, because Father refused to answer phone calls or respond to text messages. Asked what happened when the parties did communicate, Mother testified as follows:

I physically dread having to talk to [Father] about anything, and I don't like that I feel that way. But it is never easy trying to talk to him. I mean, it's – it's the littlest things become the most dramatic ordeals.

I mean, I feel like that, no matter what I say, how I say it, how I present it, there's going to be a problem. I'm not going to get it right, and there will be an issue with it, no matter what it is, in some way.

Mother stated that, when she signed Paisley's Head Start application, she was not attempting to deceive anyone. She provided the information that Ms. York requested, and Ms. York completed the application. Mother testified that Ms. York then presented her with the completed application, and Mother signed the document without reading it because she "trusted that it was right."

Mother testified that, according to the children, Father repeatedly told them that "whatever he buys stays with him, whatever goes to his house stays at his house, whatever is at his house stays at his house." For instance, Father required that Landon's Overton County baseball uniform remain at Father's home and, when Landon received a baseball trophy in Overton County, Father "took his trophy and told him that it would stay at [Father's] house."

Mother stated that she dated Joseph King for approximately three months in early 2015. When Mother began dating Mr. King, she knew he "had a thing for partying and being pretty wild" in the past, but she believed he had changed because she spoke to members of his family and was told that he "had been doing really good." Mr. King sometimes interacted with the children, but usually when Mother was present. Mother admitted that, on one occasion, she permitted Landon to ride in a truck with Mr. King. She testified, however, that she drove closely behind the truck the whole time. Mother's relationship with Mr. King ended in June 2015 when he assaulted her. Mother stated that she reported the assault to the police and that neither she nor the children have had any contact with Mr. King since that time.

Captain Newell Leroy Routh, IV, testified on behalf of Father. He had served with Father in the military. Captain Routh stated that Father had worked as a recruiter under his command and Father determined his own work schedule as a recruiter. Captain Routh explained as follows:

> All we ask that our recruiters do is that they work eight hours a day. . . . I've seen some at 3:30 in the afternoon and I've seen them go to 1:00 at night. . . . these guys don't really have a set schedule. So we call it a Swiss cheese schedule. They're in and out, but eight hours a day of work. That's all I'm asking.

Two witnesses, Cindy Prater and Robin Storie, testified on behalf of Father in regard to Landon's academic performance. Ms. Prater was the principal at the school Landon attended in Overton County. She testified that Landon performed well academically, but he needed special attention, emotionally, on two occasions after Mother visited him at school. Ms. Prater stated that Father ate lunch with Landon several times, and it appeared that they had a good relationship.

Ms. Storie was Landon's third grade teacher in Pickett County. She stated that Mother informed her that Landon "was having a rough time." Specifically, Mother told her that Landon lacked self-confidence and "seemed to have a little bit harder time in math than he did in reading." Ms. Storie described Landon as an excellent student and stated that, contrary to Mother's assertions, his records from both Overton County and Pickett County showed that he had no problems with math. Asked if Landon had any problems with his homework, Ms. Storie stated that he did not complete his homework assignments on a few occasions—all of which occurred during Mother's parenting time.

Ms. Storie stated that Father had done nothing to make her feel uncomfortable and that he appeared to be a caring father. She admitted, however, that she was angry with him once after learning that he had recorded some of the conversations he had with her. With regard to Mother, however, Ms. Storie testified that Mother had made her uncomfortable on one occasion. Specifically, she became uncomfortable when Mother told her that Father had stalked Mother and punched her vehicle. When Mother mentioned these incidents, Ms. Storie did not believe her because Mother had a reputation for exaggerating things. During cross-examination, Ms. Storie changed her opinion of Mother's truthfulness after reading the order of protection that found Father had stalked Mother and had engaged in conduct constituting abuse when he punched Mother's vehicle.

Father next presented the testimony of Alexandra Vance. She was a family and marriage therapist who had conducted multiple therapy sessions with Father prior to the parties' divorce. Ms. Vance testified that she also conducted two joint sessions with Mother and Father. She stated that she could only testify regarding Father, however,

because she had his written permission, but she did not have Mother's written permission. In the individual therapy sessions, Ms. Vance helped Father develop anger management skills. She believed that he "did very well" managing his anger. Ms. Vance also assessed Father's parenting skills and determined that he was "absolutely caring, loving and devoted to his children."

Father testified regarding the reasons he believed Mother should no longer be the primary residential parent. First, he stated that, if she was willing to change her employment to Pickett County schools and enroll the children there, she may accept employment in another county and move the children again. Next, Father stated that Landon suffered from digestive problems due to Mother allowing him to eat too much fast food. Lastly, Father testified that she misled the trial court in her motion to enroll the children in school in Pickett County by claiming that Landon struggled academically in Overton County. Father testified that Landon was "doing just fine" in Overton County because "[h]e had friends" and "[h]is work was good."

Father presented contradictory testimony regarding his work schedule as a recruiter for the National Guard. He initially testified that he had some flexibility because there was no set time he had to be in his office. He was merely required to work at least forty hours per week. When asked why he failed to take Paisley to Head Start on more than thirty occasions, however, Father responded that his work schedule prevented him from doing so each time. He then contradicted this testimony by admitting that, on one of those occasions, his schedule had not prevented him from taking Paisley to Head Start. He had taken Paisley to day care in Overton County, drove Landon to school in Pickett County, and then waited all day in Pickett County until Landon got out of school. Father testified that, although he drove to Pickett County that day, he did not take Paisley to Head Start because she did not want to go.

Father also testified that he would drive Landon to a bus stop in Pickett County so he could ride the bus to school. According to Father, he made this arrangement so he could "get to work on time." Although the children on the bus allegedly bullied Landon, Father continued to insist that Landon ride the bus. Father explained that he investigated the incident and believed that some of the children on the bus had been "aggravating" Landon, but "they weren't bullying him." He stated that, on the days his work schedule did not permit him to drive the children to school in Pickett County, he was not willing to meet Mother at the Pickett County line to allow her to drive the children to school because he liked to spend time with Landon before he got on the bus. During cross-examination, Father admitted to stating in his deposition that the reason he objected to meeting Mother at the Pickett County line was "because if she can drive all the way to the school bus stop then why can't she drive them a few more miles to the elementary school in Overton County?"

Father acknowledged that he did not take Paisley to her Head Start graduation ceremony. He testified that, because Mother notified him about the graduation ceremony at the last minute, he was unable to alter his work schedule so Paisley could attend. During cross-examination, Father admitted that he received three-weeks' notice of the graduation ceremony but claimed that was insufficient notice to alter a planned work event he needed to attend in Putnam County that day. Despite knowing that he could not take Paisley, he did not call Mother and offer to allow her to take Paisley to the ceremony. He stated that "she'd already asked on my parenting time to come get [Paisley] any how to take her to [Head Start]. So why didn't she come to the day care and get her?"

Regarding Landon's counseling, Father acknowledged that Mother first mentioned Landon needing counseling in late summer or early fall of 2014. Father stated that he did not consent to enrolling Landon in counseling, but he denied refusing consent. Instead, he testified that he merely asked Mother if they could discuss the issue another time because he was out of town for military training. In January 2015, Father began attending family counseling with both children.[4] He received a text message from Mother on February 4, 2015, expressing her continued belief that Landon needed counseling. Father testified that he did not mention attending family counseling with the children because he had already discussed the issue with Mother sometime between mid-January and the first of February.

Father testified that he learned Mother had enrolled Landon in counseling with Sheila Masters after he received explanation of benefit statements ("EOB") from his insurance provider in July 2015. Upon learning this, Father visited the counseling center and objected to Ms. Masters's office billing his insurance for the sessions despite the parenting plan requiring him to maintain health insurance for the children. Father stated that he informed the office manager that billing his insurance for Landon's counseling "could be illegal." According to Father, he was not attempting to stop the counseling sessions, but rather, he was merely concerned about how to pay for them: "If she was going to be taking [Landon] on her time and I was unaware of it, then why couldn't she use her insurance." He admitted, however, that he was unaware of whether Mother provided any insurance for the children.

Father testified that he decided Landon needed counseling after meeting with Ms. Masters and hearing her recommend counseling for Landon. Father obtained a list of Landon's past and future counseling sessions that showed Mother had stopped taking him to counseling. Father then scheduled counseling sessions for Landon during his

---

[4] During cross-examination, Father adamantly denied that he "enrolled" the children in family counseling, stating that he could not enroll them because the counseling service was provided by the military. As a result, he was the only one "enrolled" in the family counseling: "That was something that I called on my own and got for me and they attended."

parenting time. Father testified that Mother's had exhibited poor judgment by failing to take Landon to all of the counseling sessions.

Father stated that Mother also demonstrated poor judgment by exposing the children to Joseph King. When Mother began dating Mr. King in early 2015, Father did not believe Mr. King was a danger to the children. He later changed his mind after speaking with acquaintances of Mr. King. For instance, Father testified that people who grew up with Mr. King told him "that it wasn't something that was unknown that Joseph King used drugs and had a criminal history." Based on what he had heard about Mr. King, Father believed that Mother knew at the time she was dating Mr. King that he was a danger to the children. Father admitted that he hired an investigator to perform a criminal background check on Mr. King shortly after Mother started dating Mr. King and that the background check failed to reveal "anything very concerning." Father did not learn of Mr. King's criminal history until October 2015, when Father's attorney conducted a second background check on Mr. King. Father acknowledged that, by the time of the second background check, Mother had ceased all contact with Mr. King.

Father testified that he secretly recorded conversations with several people including Landon, Ms. York, Ms. Storie, and Ms. Masters. He also recorded numerous conversations with various people during Landon's baseball games. According to Father, he recorded these conversations because he believed he "needed to protect" himself. Father denied recording any of Landon's counseling sessions or either of the joint sessions Father and Mother had with Ms. Masters.

Father stated that, during one of Landon's baseball games, he observed Paisley playing with "a rope or cord or something" near Mr. Neff. After witnessing Mr. Neff pull the cord or rope and then put his hands on Paisley, Father approached Paisley, not Mr. Neff. Father testified that he was concerned about Paisley being around Mr. Neff because he had recently "found out that [Mr. Neff] possibly had been using drugs or was on drugs." Father then picked Paisley up and stated to Mr. Neff, "[W]hen I get to know you better, then you can play with my kids." According to Father, Mr. Neff responded, "This is Number 3, ole boy," and "[t]here will be a time and a place."

Father denied stating that he wished he could kill Mother. He also denied ever calling Mother "bad names" in front of the children. He admitted that, in January and February 2015, he wrote Mother fifty-nine separate checks for her alimony payments. Father explained that he wrote so many separate checks because he had learned that it was a method for managing his money. He acknowledged, however, that "it could have been a little bit of frustration."

Sheila Masters testified as an expert witness on behalf of Father. Ms. Masters had testified as an expert in the areas of family therapy and mental health several times prior to testifying in this case and had been admitted as an expert witness in Tennessee,

Louisiana, and Virginia.[5]  She stated that, in forming her opinions, she relied on "[s]tatements from the child, statements from the parents, information that I have become privy to in court."

Ms. Masters began counseling Landon in April 2015.  During the first session, she performed an initial assessment in which Mother provided background information about Landon and explained why she enrolled him in counseling.  Ms. Masters testified that Mother reported that Landon "had been experiencing anxiety, outburst[s], difficulty sleeping, temper issues, depression, difficulty dealing with stress, nightmares, decreased appetite, general unhappiness, difficulty making decisions and poor concentration."  Landon denied experiencing these problems, however, when Ms. Masters addressed them during counseling sessions.  Rather, he reported that he did not "have a big problem."  Landon never disclosed to Ms. Masters that he heard Father call Mother bad names or express a desire to kill Mother.

Concerning the March 20, 2015 incident, Ms. Masters stated that Landon described it as follows: "[H]e and Paisley were in the car and he heard a loud bang.  That it initially startled him.  It made Paisley cry and that he did feel scared for the moment."  In a document Landon completed for Ms. Masters, he stated that "[t]he worst thing that's happened is that dad punched mom's car."  Ms. Masters observed, however, that Landon had no residual fear of Father as a result of the incident.  In fact, he reported feeling safe with Father and appeared to be "extremely relaxed with his dad."

Ms. Masters testified that Landon reported feeling afraid of one thing—"that my dad has done some stuff to my mom and that I'm afraid that he might do something to hurt my mom."  Landon never clarified what Father had done to Mother in the past to cause this fear, but Landon mentioned that, "when mom feels bad or is having a hard time, . . . it's because dad has hurt her feelings or done some really bad stuff."  Ms. Masters stated that Landon expressed a desire "to help mom not to feel bad."  She explained that it makes him uncomfortable to see Mother "upset or angry or having a bad day or hard time."  Ms. Masters opined that Landon's fear was the result of emotional transference, which she explained occurred "when someone's anxiety is--causing another person anxiety."  According to Ms. Masters, this is a behavior associated with parental alienation.  She did not, however, conclude that Landon had been alienated from either parent.

Ms. Masters also testified that Landon disclosed that Mother and Father "frequently yell at one another."  Landon expressed a desire for Mother and Father "to be able to at least talk to each other," but he believed "that his parents will never get along."  Ms. Masters opined that the parties needed to address the underlying issues causing "all

---

[5] Ms. Masters did not specify the number of times she has testified as an expert witness, and the record does not contain a curriculum vitae stating how many times she has testified as an expert witness.

this animosity." Consequently, she suggested that both parties undergo a psychological evaluation with Scott Herman.

Ms. Masters testified that, after Mr. Herman conducted the psychological evaluations of both parties, he disclosed the results and recommendations to her. Father's evaluation indicated that he was experiencing "stress-related symptoms," and Mr. Herman recommended therapy to address the issue. Mr. Herman reported that Father entered into therapy with Mr. Herman and fully resolved the issue.

Mother's evaluation indicated that she experienced "situational stress, which led to excessive self-criticism." According to Ms. Masters, Mr. Herman recommended that Mother enter cognitive behavioral therapy. Ms. Masters criticized Mother for failing to complete Mr. Herman's recommendation. She admitted during cross-examination, however, that she refused to disclose to Mother the results of the psychological evaluation and Mr. Herman's recommendation when Mother requested the information. Instead, Ms. Masters directed Mother to contact Mr. Herman. Ms. Masters acknowledged that Mother then informed her that Mr. Herman had advised Mother to contact Ms. Masters because she knew of the recommendation. Ms. Masters further acknowledged that Mr. Herman recommended that Ms. Masters conduct the cognitive behavioral therapy with Mother. Ms. Masters refused to conduct the recommended therapy, explaining that it would have been a conflict of interest because "doing individual therapy with one parent and not the other . . . can be presumed to be biased." This concern, however, did not prevent Ms. Masters from conducting a counseling session with Father in December 2016.

Ms. Masters testified that she conducted approximately four joint counseling sessions with the parties. Based on these sessions, she determined that the parties' main problem was communication. Before fully addressing the communication issue, however, Ms. Masters terminated the joint counseling sessions. She explained that she believed it necessary to end the sessions "due to privacy issues." Specifically, Father informed her that he had secretly recorded several of the joint sessions.

Ms. Masters initially testified that Mother had only six strengths as a parent: (1) she completed her psychological evaluation, (2) she acknowledged that Landon needs both parents, (3) she arranged for Landon's counseling, (4) she brought him to his counseling appointments, (5) she no longer argued in Landon's presence, and (6) she did not desire to reduce Father's parenting time if his behavior improved. During cross-examination, Ms. Masters conceded that Mother, in fact, had several strengths in addition to the six previously identified. These additional strengths included: she made an attempt at joint decision-making by sending Father a letter informing him that she wanted to enroll the children in Pickett County schools and explaining why she wanted to make that change, she consulted Father about Landon's need for counseling, and she asked Father to call when the children wanted to talk with him.

When asked to identify Father's weaknesses, Ms. Masters initially testified that he had only the following two: "buying into arguments and a history of stress-related problems." She later admitted that he had several additional weaknesses, including: signing Landon up for baseball without informing Mother, refusing to provide Landon's baseball coach with Mother's contact information upon the coach's request, and blocking Mother's text messages.

Ms. Masters testified that Father often inquired about Landon's emotional needs and his progress in counseling but Mother failed to do so. Ms. Masters admitted, however, that she would not speak with Mother after Landon's sessions because "if I went down and immediately started talking to his mom, the child would automatically assume I was telling her what happened." Despite having this concern about Mother, Ms. Masters acknowledged that she met with Father after Landon's sessions on several occasions. Ms. Masters also admitted that she rarely returned Mother's phone calls and often failed to respond to Mother's emails. She acknowledged, however, that she frequently answered or returned Father's phone calls.

Ms. Masters testified that, prior to one of Landon's sessions, Mother entered her office without Landon and informed her that she was concerned about Father not allowing the children to bring items to Mother's home. When Landon entered shortly thereafter, he immediately stated that "dad has rules that if something's [at Father's] it stays there, and if something's brought there it stays there." Ms. Masters opined that this indicated Mother had been "coaching" Landon about what to say. She stated that she based this opinion on her research and experience. When asked what research she relied upon, Ms. Masters responded:

> I don't - - I had focused on some of the other - - you can find it in a number
> of - - I don't have anything specific to refer to on that, but it is - - it is
> something that I'm sure is highly documented.

Moreover, she could not explain or describe any research related to "coaching." Regarding her experience with "coaching," she simply stated that she had "run across it frequently in divorce cases."

Ms. Masters opined that Mother's requests that Father allow the children to call her daily while they are with him constituted "access denial." She admitted that she was unaware of any research supporting her opinion. Instead, she merely stated that her opinion was based on her twenty years of experience. She provided no explanation as to how she formed her opinion based on her experience. Finally, Ms. Masters opined that Landon would be devastated if Father's parenting time was reduced because Landon repeatedly mentioned that "he would like 50/50 visitation with both parents."

## Trial Court's Ruling

In an order entered on May 1, 2017, the trial court made detailed findings of fact regarding the credibility of key witnesses. Most notably, the court found that, although there were some discrepancies in Mother's testimony, she was more credible than Father. Additionally, the court found that Ms. Masters's expert testimony was not reliable. Based in large part on these credibility assessments, the court determined that Mother established that a material change in circumstances had occurred and that modification of the parenting plan was in the best interest of the children. The court found that the following material changes in circumstances had occurred: Father committed an act of physical abuse, engaged in a pattern of emotional abuse, and abusively used conflict that created a danger of damage to the children's psychological development. The court reduced Father's parenting time from 141 days to 78 days per year, granted Mother sole decision-making authority, and awarded Mother 75% of her attorney fees. Regarding Father's counter-petition, the court concluded that Father failed to prove any material change in circumstance warranting a change in the primary residential parent. Father filed a motion to alter or amend the judgment requesting, among other things, that the parenting plan be amended to reflect the number of days the children actually spend with Father. The trial court granted the requested amendment and amended the parenting plan to reflect that Father had 104 days of parenting time per year.

Father appeals and raises the following issues: (1) whether the trial court erred in significantly reducing his residential parenting time and (2) whether the trial court erred in awarding Mother 75% of her attorney fees.

### STANDARD OF REVIEW

Our review of the trial court's findings of fact is de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). Determinations regarding whether a material change in circumstances has occurred and whether modification of a parenting plan is in a child's best interest present factual questions. *Armbrister*, 414 S.W.3d at 692. Therefore, we "must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Id.* at 693. Evidence preponderates against the trial court's findings of fact when it "support[s] another finding of fact with greater convincing effect." *Hopwood v. Hopwood*, No. M2015-01010-COA-R3-CV, 2016 WL 3537467, at *4 (Tenn. Ct. App. June 23, 2016). We review the trial court's conclusions of law de novo, according them no presumption of correctness. *Armbrister*, 414 S.W.3d at 692.

Decisions regarding parenting schedules are "factually driven." *Id.* at 693. Because trial judges are in a better position to observe witnesses and make credibility

assessments, they have broad discretion to determine the details of parenting plans. *Id.* We will not reverse the trial court's decision absent an abuse of discretion. *Id.* A trial court abuses its discretion when it "'appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id.* (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)). Under the abuse of discretion standard, the trial court's decision "'will be upheld so long as reasonable minds can disagree as to propriety of the decision made.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)).

Because a trial judge is "'uniquely positioned to observe the demeanor and conduct of witnesses,'" we afford considerable deference to issues a trial court decides that are based on witnesses' credibility. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). We will not reevaluate a trial judge's assessment of a witness's credibility unless there is clear and convincing evidence to the contrary. *Id.* Evidence is clear and convincing if it "eliminate[s] any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* at 692-93 (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)).

ANALYSIS

I. <u>Modification of Parenting Schedule</u>.

When assessing a petition to modify a residential parenting schedule, a court must first determine whether a material change in circumstances has occurred since entry of the parenting plan sought to be modified. Tenn. Code Ann. § 36-6-101(a)(2)(C); *Broadrick v. Broadrick*, No. M2013-02628-COA-R3-CV, 2015 WL 1947186, at *3 (Tenn. Ct. App. Apr. 29, 2015). The petitioner bears the burden of proving by a preponderance of the evidence that "a material change of circumstance affecting the child's best interest" has occurred. *Id.* If a material change in circumstances is established, the trial court must then "determine whether modification of the schedule is in the best interest of the child, utilizing the factors at § 36-6-106(a) and, where applicable, § 36-6-406." *Wheeler v. Wheeler*, No. M2015-00377-COA-R3-CV, 2016 WL 3095695, at *3 (Tenn. Ct. App. May 24, 2016).

On appeal, neither party has challenged the trial court's conclusion that Mother proved a material change in circumstances had occurred and, upon our review, the evidence supports this conclusion.[6] We, therefore, proceed to address the trial court's

---

[6] The trial court's May 1, 2017 order does not expressly state that a material change in circumstances had occurred. It is implicit from the court's detailed findings of fact and conclusions of law, however, that the court determined that a material change in circumstances had occurred due to Father committing an act of

determination that modification of the residential schedule was in the best interest of the children.

>    A.  Limiting Factors in Tenn. Code Ann. § 36-6-406.

In determining whether modification of the residential schedule was in the children's best interest, the trial court first considered whether the factors enumerated in Tenn. Code Ann. § 36-6-406 applied.  Tennessee Code Annotated section 36-6-406 provides, in pertinent part:

> (a) The permanent parenting plan and the mechanism for approval of the permanent parenting plan shall not utilize dispute resolution, and a parent's residential time as provided in the permanent parenting plan or temporary parenting plan *shall be limited* if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:
> . . . .
> (2) Physical or sexual abuse or a pattern of emotional abuse *of the parent*, child or of another person living with that child as defined in § 36-3-601.
> . . . .
> (d)  A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court *may preclude* or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:
> . . . .
> (5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development[.]

(Emphasis added).  The plain language of subsection (a) is mandatory.  Thus, a court must limit a parent's residential parenting time if the court determines that the parent has engaged in any of the conduct enumerated in subsection (a).  *See Burden v. Burden*, 250 S.W.3d 899, 913 (Tenn. Ct. App. 2007).  The plain language of subsection (d) is permissive, allowing a court to limit a parent's residential time if a parent engages in conduct enumerated in this subsection.

Here, the trial court determined that "it is mandatory that [Father's] visitation be limited in some way" because he engaged in conduct enumerated in Tenn. Code Ann. § 36-6-406(a)(2).  The court made the following pertinent findings of fact:

---

physical abuse, engaging in a pattern of emotional abuse, and abusively using conflict.  *See Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013) ("Court orders and judgments, like other documents, often speak as clearly through implication as they do through express statements. Accordingly, when construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated.").

- 18 -

. . . The General Sessions Court found that [Father] "engaged in conduct that constitutes abuse as defined in Tenn. Code Ann. § 36-3-301; specifically, he struck [Mother's] vehicle in a malicious manner, attempting to, and actually causing damage to the vehicle." Further, the General Sessions court found that, on February 18, 2015, [Father] engaged in conduct that constitutes stalking as defined by Tenn. Code Ann. § 39-17-315. The General Sessions Court found further that [Father] engaged in "a course of conduct in an effort to inflict emotional harm on [Mother]," and that such conduct "would put a reasonable person in fear, and . . . actually put [Mother] in fear." Finally, the General Sessions Court also found that [Father] sought a criminal summons against [Mother] vindictively. . . . There exists an identity of issues sufficient for collateral estoppel effect as to [the General Sessions court's] finding that [Father] engaged in conduct that constitutes "abuse" within the meaning of § 36-3-301.

Other reliable evidence presented to this court . . . demonstrates that [Father's] conduct constitutes a pattern of emotional or psychological abuse. . . .

. . . .

Other instances of emotional abuse by [Father] include:
- Surreptitiously recording conversations with [Mother], including counseling sessions;
- Calling her profane names in the presence of the children;
- Refusing to exchange text messages with her for long periods of time;
- Trying to interfere with her employment (by calling Diane Elder and accusing [Mother] of fraud);
- Vindictively swearing out a criminal summons against [Mother], thereby requiring that she be booked and processed and incur attorney fees;
- Accusing her husband of using methamphetamine;
- Stating in Paisley's presence that he did not have to respect anything [Mother] said.

Father does not challenge the trial court's findings of fact relating to the determination that he committed abuse. Rather, he asserts that the trial court erred in limiting his parenting time pursuant to Tenn. Code Ann. § 36-6-406 because, although he exhibited disagreeable conduct toward Mother that may have adversely affected her, the record contains no proof that his behavior adversely affected the children. This argument is without merit. Under Tenn. Code Ann. § 36-6-406(a)(2), the trial court's duty to limit or restrict the abusing parent's residential parenting time is mandatory and is not limited to situations where the parent's abuse adversely affected the children. The plain language of the statute mandates that the court restrict the abusing parent's residential time if he or she engages in "[p]hysical or sexual abuse or a pattern of emotional abuse *of the parent,*

*child or of another person living with that child as defined in § 36-6-601.*" Tenn. Code Ann. § 36-6-406(a)(2) (emphasis added). Thus, a parent's abuse of the other parent is clearly contemplated by Tenn. Code Ann. § 36-6-406(a)(2).

In the present case, the trial court found that Father both physically abused Mother and engaged in a pattern of emotional abuse of Mother. The evidence does not preponderate against these findings. Most notably, the record shows that Father punched Mother's vehicle, stalked her, vindictively swore out a criminal summons against her, and secretly recorded conversations with her during therapy sessions and at Landon's ball games. Therefore, the trial court was required to limit Father's parenting time pursuant to Tenn. Code Ann. § 36-6-406(a)(2).

The trial court also determined that Father engaged in conduct enumerated in Tenn. Code Ann. § 36-6-406(d) that permitted limiting his residential parenting time. Specifically, the court determined that Father engaged in conduct constituting an abusive use of conflict. *See* Tenn. Code Ann. § 36-6-406(d)(5). The court made the following findings of fact supporting this determination:

> [Father] tried to provoke a fight with Mr. Neff at the ballpark, during one of Landon's ballgames. [Father] was belligerent with [Mother] at the ballpark and forcefully took Paisley out of [Mother's] arms. . . .
> [Father] refused to take Paisley to Head Start; he knew that [Mother] wanted Paisley at Head Start and he used that desire to create conflict. His schedule was purportedly not flexible enough to take the child to school.
> . . . .
> [Father] refused to take Paisley to her Head Start graduation. This is another instance of thwarting [Mother's] desires in order to create conflict.
> . . . .
> [Father] recorded conversations with Landon, Landon's teacher, Head Start personnel, daycare providers, and Ms. Masters (who was initially quite irate about the recording). This was abusive use of conflict.
> . . . .
> The court would be remiss if it did not point out that there has been a pattern of surveillance type activity by [Father]. He undertook his own investigation of Mike Neff and Joseph King. He followed Mr. Neff and [Mother] on certain occasions. He seemed to be unusually aware of [Mother's] whereabouts and actions. This is an abusive use of conflict.
> Other examples of [Father's] abusive use of conflict include:
> - Delivering [Mother's] alimony for the month of January 2015 in 31 separate checks; and delivering alimony for February 2015 in 28 separate checks;
> - Cutting Paisley's hair without consulting or notifying [Mother] (this was intentionally provocative);

- 20 -

- Refusing to cooperate with [Mother] to coordinate Christmas presents for the children;
- Belligerently responding to [Mother's] efforts to provide information about school cancellation and offers of help in picking up the children.
- Refusing to tell [Mother] the name of a person babysitting the children on January 13, 2017.

On appeal, Father does not challenge the trial court's findings regarding his abusive use of conflict. He again asserts that the trial court erred in reducing his parenting time because his conduct did not adversely affect the children. Father seems to genuinely love the children, but a thorough examination of the record shows that his conduct did, in fact, adversely affect them. For instance, Ms. Masters testified that Landon felt protective of Mother and worried about how Father treated her. Moreover, Ms. Masters stated that Landon experienced anxiety as a result of the conflict between the parties; he reported feeling "nervous and weird" when his parents disagreed with each other. Paisley expressed concern about Father having a picture of Mother and Mr. Neff on his phone because she knew that Father did not like Mother. Paisley repeatedly mentioned the incident when Father punched Mother's vehicle.

This Court finds it troubling that, since the trial court entered its final judgment, Father has continued to abusively use conflict. As evidenced by a post-judgment order on contempt that Mother attached to her motion for this court to consider post-judgment facts,[7] Father ambushed Mother at the Overton County fair on July 21, 2017, and attempted to take both children from her. In the post-judgment order on contempt entered on March 9, 2018, the trial court made the following pertinent findings:

> As [Mother] proceeded toward the entrance, [Father] approached [Mother] at a "speed-walk" pace and circled around her so as to impede her forward progress toward the building entrance. He took these actions with the clear purpose of trying to take Paisley out of [Mother's] arms. Simultaneously, and in accordance with a plan that had been previously made between Father and Carolyn Burchfield [his mother], Ms. Carolyn Burchfield took Landon with her back to the vehicle so that he could be taken to a friend's house where [Father] had arranged for Landon to spend the night.

We agree with the trial court's statements that "the children are noticing and internalizing this conflict" and "it creates a danger of damage to [their] psychological development." The children need the parties to coexist without continual conflict. We

---

[7] Mother's motion to consider post-judgment facts is hereby granted.

conclude that a preponderance of the evidence supports the trial court's decision to limit Father's residential parenting time pursuant to Tenn. Code Ann. § 36-6-406(d)(5).

B.  Best Interest Factors in Tenn. Code Ann. § 36-6-106(a).

After determining that Tenn. Code Ann. § 36-6-406 applied to the facts of this case, the trial court considered the best interest factors contained in Tenn. Code Ann. 36-6-106(a)(1)-(15) and concluded that it was in the best interest of the children to modify the residential parenting schedule. The court made the following findings of fact regarding the applicable factors:

*(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.*

As the above findings show, [Father] has not done this very well, but [Mother] has made a great effort in this respect.

*(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;*

Both parents have this disposition, but [Father] resisted enrolling Landon in counseling and refused to take Paisley to Head Start.  [Father] has [the] ability to provide for the children going forward.

*(7) The emotional needs and developmental level of the child;*

Both children need the parents to get along.  [Father] has not made consistent efforts to cooperate and has repeatedly tried to antagonize [Mother].

*(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child.*

[Father] contended that [Mother's] relationships with different men, affected her moral fitness or ability to safeguard [the] children.  However, the court finds that both parents are involved in long-term relationships. The court has no significant concern about [Mother's] moral fitness. Likewise, the court finds that [Mother] is emotionally fit and is a nurturing and attentive parent. . . .

[Father] has been able to maintain a positive relationship with the children and routinely plans fun outdoor activities and outings for them. [Father] can be emotionally fit for parenting responsibilities, but in the course of this litigation there have been repeated instances of lashing-out behavior by [Father]. The court has observed that [Father] lashes out in anger when he feels threatened or his control is threatened. For example, he tried to interfere with [Mother's] employment, vindictively swore out a criminal summons against her, and accused Personal Growth Counseling Center of fraud because the center billed his insurance. The court recognizes that [Father] has voluntarily sought anger management and counseling, and this is a positive thing.

*(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;*

Both parents have provided a stable, satisfactory environment for the children. [Father] tried to call into question [the] stability of [Mother's] home, but the court does not accept that contention.

*(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . .*

The court has already outlined [Father's] emotional abuse of [Mother].

*(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;*

The court has seen no credible evidence that Mike Neff is an unwholesome influence or that he is involved with drugs. The children have adjusted to Mr. Neff, and [Mother] has set appropriate boundaries in his regard. Both Mr. Neff and [Mother] told the children that Mr. Neff will never replace their father.

. . . .

*(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules.*

In adopting the parenting plan, the court has taken into consideration [Mother's] employment schedule. [Mother] is employed as a teacher at Pickett County High School. The children will attend Pickett County

schools and will have [the] same academic schedule as their mother. She can transport them to and from school.

*See* Tenn. Code Ann § 36-6-106(a)(2), (4), (7)-(8), (10)-(12), (14).

Father asserts that the trial court erred in concluding that substantially limiting his parenting time was in the best interest of the children because "[a] fair consideration of the [best interest] factors demand[s] that the parties' residential time with their children be equal, with some minor reduction based upon the purported 'abuse' of the Father against [Mother]." In particular, he asserts that the trial court erred in rejecting Ms. Masters's testimony that significantly reducing Father's parenting time would harm the children. The trial court rejected Ms. Masters's expert testimony because it found her testimony was biased and lacked analytical cohesion. Father acknowledges that appellate courts generally will not reevaluate a trial court's assessment of a witness's credibility unless there is clear and convincing evidence to the contrary, *Kelly*, 445 S.W.3d at 692, but he argues that this court must review Ms. Masters's testimony de novo because her expert opinion is "derived almost solely from contemporaneous notes." When expert opinions appear "in the record purely in the form of written documents, an appeals court 'may draw its own conclusions about the weight and credibility of that testimony, since we are in the same position as the trial judge.'" *Burden*, 250 S.W.3d at 905 (quoting *Krick v. City of Lawrenceburg*, 945 S.W.2d 709, 712 (Tenn. 1997)); *see also Kelly* 445 S.W.3d at 693.

To support his argument, Father relies on *Burden v. Burden* 250 S.W.3d 899 (Tenn. Ct. App. 2007). That case involved a child custody dispute in which a psychologist conducted a psychological evaluation of the mother and the father. *Burden*, 250 S.W.3d at 903. After completing the evaluation, the psychologist prepared a written report that was introduced into evidence at trial without objection from either party. *Id.* at 903, 915. The trial judge rejected the psychologist's report, providing no reason other than the following statements: "I don't like this one. I don't like the way it is done. I don't like the results." *Id.* at 915. On appeal, we reviewed the psychologist's report de novo noting that, because the report was "nothing but the 'cold printed word,' we may draw our own conclusions from the record.'" *Id.* at 916 (quoting *Deitmen v. Deitmen*, No. 86-30-II, 1986 WL 6057, at *1 (Tenn. Ct. App. May 29, 1986)). We found the report credible and more probative than other evidence. *Id.* Consequently, we concluded that the trial court's custody determination and permanent parenting plan were "contrary to the weight of the evidence." *Id.* at 918.

Father's reliance on *Burden* is misplaced. Ms. Masters did not prepare a written report. Rather, she testified in person, often consulting her counseling notes before stating her expert opinions. The parties then entered her counseling notes into evidence. A review of the counseling notes shows that they contain some of the details from Landon's therapy sessions, but they do not contain Ms. Masters's expert opinions. Thus,

unlike in *Burden*, Ms. Masters's expert opinions do not appear in the record solely in the form of written documents. They appear in the record as in-person testimony. Because we are not dealing with only the "cold printed word," we defer to the trial court's determination that Ms. Masters's testimony was biased and lacked analytical cohesion, absent clear and convincing evidence to the contrary. *Deitman*, 1986 WL 6057, at *1. Father does not present clear and convincing evidence to the contrary. We, therefore, decline to reevaluate the trial court's assessment of Ms. Masters's testimony.

In light of the foregoing, we conclude that the trial court did not abuse its discretion in modifying the residential parenting schedule by reducing Father's parenting time to 104 days per year.

II.  Attorney Fees.

A.  At Trial.

Father asserts that the trial court erred in awarding Mother attorney fees in the amount of $51,742.50. Litigants are generally required to pay their own attorney fees unless a statute or contract provision provides otherwise. *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998). Mother asserted a claim for attorney fees pursuant to the parties' MDA and Tenn. Code Ann. § 36-5-103(c). The Tennessee Supreme Court has held that, when courts determine whether attorney fees should be awarded in a post-divorce custody case, the following procedure applies:

> Because fee provisions in marital dissolution agreements are binding on the parties, when confronted with a request for fees under both contractual and statutory authority, our courts should look to the parties' contract first before moving on to any discretionary analysis under statutes such as section 36-5-103(c) and section 27-1-122. Courts reviewing requests for fees pursuant to a MDA fee provision should first determine whether the parties have a valid and enforceable MDA that governs the award of attorney's fees for the proceeding at bar. If so, our courts must look to the actual text of the provision and determine whether the provision is mandatory and applicable. If so, the MDA governs the award of fees, and our courts must enforce the parties' contract.
>
> If the court determines the MDA is inapplicable to the case, it should so state on the record and then turn to the parties' statutory claims under which any award of fees is within the sound discretion of the trial or appellate courts unless otherwise specified in the statute. Even if the court determines that an award of attorney's fees is mandated by the terms of the MDA, the court still should also review the claims for fees or expenses under any applicable statutory authority.

*Eberbach v. Eberbach*, 535 S.W.3d 467, 478-79 (Tenn. 2017) (footnote omitted).

We begin our analysis of the issue with the parties' MDA, which contains the following applicable provision:

> In the event it becomes reasonably necessary for either party to institute legal proceedings to procure the enforcement of any provision of this agreement, the successful party shall [sic] in such proceeding shall also be entitled to a judgment for reasonable expenses, including but not limited to, attorney fees incurred in prosecuting said action.

In the petition for modification, Mother requested that the trial court find Father in contempt for violating the provision of the parties' MDA awarding Mother certain items of personal property. Although not expressly stated, it is implicit from the May 1, 2017 order that the trial court found the MDA was valid and enforceable.[8] The trial court then found that Father willfully violated the MDA because he delivered the items of personal property to Mother disassembled and irreparably damaged. The court awarded Mother $3,000 "for the value of the property destroyed and as a sanction for contempt." On appeal, Father does not challenge the contempt determination. Thus, Mother was the prevailing party in a legal proceeding to procure the enforcement of a provision of the MDA. We conclude, therefore, that she was entitled to an award of her reasonable attorney fees for the contempt proceedings pursuant to the MDA.

We next address whether Mother was entitled to receive attorney fees under Tenn. Code Ann. § 36-5-103(c). In custody cases, Tenn. Code Ann. § 36-5-103(c) provides a basis for an award of attorney fees at trial. When this case was initiated, Tenn. Code Ann. § 36-5-103(c)[9] provided as follows:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of

---

[8] We note that Father did not challenge the validity and enforceability of the MDA at trial, and he makes no such challenge on appeal.

[9] Tennessee Code Annotated section 36-5-103(c) was amended in July 2018 to provide the following:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

A decision to award attorney fees to the prevailing party under Tenn. Code Ann. § 36-5-103(c) is within the discretion of the trial court, and we will not overturn the trial court's decision absent an abuse of discretion. *Eberbach*, 535 S.W.3d at 475.

Father asserts that the trial court abused its discretion in awarding Mother $51,742.50 in attorney fees because "the attorney's fees incurred and awarded in this case were not reasonable under any stretch of the imagination." If a trial court awards attorney fees without hearing proof regarding the reasonableness of the fees,

> "it is *incumbent* upon the party challenging the fee [to request a] hearing" on the reasonableness of the fees awarded. *Kline [v. Eyrich],* 69 S.W.3d [197,] 210 [(Tenn. 2002)] (emphasis in original); *see also Kahn [v. Kahn],* 756 S.W.2d [685,] 697 [(Tenn. 1988)]. Alternatively, the party challenging the fees could convince the appellate court that he was denied the opportunity to have a hearing on the reasonableness of the fees through no fault of his own. *Kahn,* 756 S.W.3d at 697. This court will not reverse a trial court's award of attorney's fees merely because the record does not contain proof establishing the reasonableness of the fees. *Kline,* 69 S.W.3d at 210. The record must contain some evidence showing that an award of attorney's fees is unreasonable before a reversal of the fees is justified. *Id.* at 210. Additionally, the record should contain at least an affidavit of the lawyer's hourly rate and time spent on the case. *See Miller [v. Miller],* 336 S.W.3d [578,] 587 [(Tenn. Ct. App. 2010)].

*Eberbach v. Eberbach*, No. M2013-02852-COA-R3-CV, 2014 WL 7366904, at *6 (Tenn. Ct. App. Dec. 23, 2014).

Here, per the trial court's request, counsel for Mother prepared and submitted an affidavit of time and expenses showing that her fees totaled $68,990. The trial court found "that this amount is a reasonable fee in the context of this protracted case." Noting that Mother's request to reduce Father's parenting time to only 52 days per year invoked Father's strong defensive reaction, the trial court concluded that she was entitled to only $51,742.50 in attorney fees (75% of $68,990). Father did not object to the fees or request a hearing on the reasonableness of the fees before the trial court. We conclude, therefore, that Father waived this issue and may not raise it on appeal. *See Scherzer v. Scherzer*, No. M2017-00635-COA-R3-CV, 2018 WL 2371749, at *18 (Tenn. Ct. App. May 24, 2018). We affirm the award of attorney fees.

B.  On Appeal.

Mother requests that she be awarded her attorney fees on appeal.  She again claims she is entitled to her attorney fees pursuant to the parties' MDA and Tenn. Code Ann. § 36-5-103(c).  As we explained above, the MDA provides that a party is entitled to a judgment for attorney fees if he or she is successful in prosecuting an action to enforce a provision of the MDA.  If Father had appealed the trial court's contempt determination, we would agree that Mother is entitled to attorney fees on appeal because that issue would pertain to enforcement of a provision of the parties' MDA.  Father did not, however, appeal the contempt determination.  Instead, he chose to limit his appeal to the trial court's decision to modify the permanent parenting plan.  The MDA contains no provision regarding either custody or a parenting plan.  We conclude, therefore, that Mother is not entitled to an award of her attorney fees on appeal pursuant to the parties' MDA.

We next consider whether Mother is entitled to her attorney fees incurred on appeal under Tenn. Code Ann. § 36-5-103(c).  In addition to applying to fees at trial, Tenn. Code Ann. § 36-5-103(c) also applies to attorney fees incurred on appeal. *Paschedag v. Paschedag*, No. M2016-00864-COA-R3-CV, 2017 WL 2365014, at *5 (Tenn. Ct. App. May 31, 2017).  We, like the trial court, have discretion to award attorney fees incurred on appeal. *Id.*  Mother has prevailed on each issue raised in this appeal.  Moreover, the record shows that Mother earns approximately $37,779.84 per year as a school teacher, while Father earns approximately $69,780.  We exercise our discretion to award Mother her attorney fees incurred on appeal.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded for a determination of Mother's reasonable attorney fees incurred on appeal.  Costs of appeal are assessed against the appellant, D. Ryan Burchfield, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE